The Honorable Robert S. Lasnik

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9    PEOPLES BANK, a Washington          NO.  C12-0939-RSL
     corporation
10                                        DECLARATION OF DANIEL BROWN IN
             Plaintiff,                   SUPPORT OF DEFENDANTS' SECOND
11                                        MOTION FOR PARTIAL SUMMARY
         v.                               JUDGMENT
12
     BLUEWATER CRUISING LLC, a            NOTED FOR HEARING ON NOVEMBER
13   Nevada limited liability company, and 15, 2013
     SUZAN NETTLESHIP, in personam
14
             Defendant.
15

16          I, Daniel Brown, do solemnly swear and state:

17   1.     I am counsel for Defendants in the above-captioned action.

18   2.     I am competent to testify in this matter and make this declaration based on my personal

19   knowledge.

20   3.     In the course of discovery in the above-captioned case, my law firm received a series of

21   documents from counsel for the Plaintiff.  Those documents include the following:

22          a.     Marine Internal Evaluation, dated Feb. 10, 2011 – A true and accurate copy of

23   this document is attached hereto as **Exhibit A**;

24          b.     Marine Internal Evaluation, dated Jan. 19, 2012 – A true and accurate copy of

25

DECLARATION OF DANIEL BROWN IN SUPPORT OF        **Williams, Kastner & Gibbs PLLC**
DEFENDANTS' SECOND MOTION FOR PARTIAL SUMMARY    601 Union Street, Suite 4100
JUDGMENT - 1                                     Seattle, Washington 98101-2380
( C12-0939-RSL)                                  (206) 628-6600

4357592.1

1    this document is attached hereto as **Exhibit B**;

2         c.    <u>Email from C. Guildner to A. Olson and D. Swift</u>, April 17, 2012 – A true and

3    accurate copy of this document is attached hereto as **Exhibit C**;

4         d.    <u>Sworn deposition testimony of C. Guildner</u>, pages 158-161 – A true and

5    accurate copy of this document is attached hereto as **Exhibit D**;

6         e.    <u>Email from P. Barratt</u>, May 22, 2012 – A true and accurate copy of this

7    document is attached hereto as **Exhibit E**;

8         f.    <u>Satisfaction of Mortgage</u> – A true and accurate copy of this document is

9    attached hereto as **Exhibit F**;

10        g.    <u>Email from C. Guildner to C. Bird</u>, June 20, 2012 – A true and accurate copy of

11   this document is attached hereto as **Exhibit G**;

12        h.    <u>Plaintiff's Supplemental Discovery Answers</u>, June 17, 2013 – A true and

13   accurate copy of this document is attached hereto as **Exhibit H**;

14        i.    <u>Email from C. Rees to C. Staunton</u>, June 25, 2012 – A true and accurate copy of

15   this document is attached hereto as **Exhibit I**;

16        j.    <u>Email from C. Guildner to C. Bird</u>, June 20, 2012 – A true and accurate copy of

17   this document is attached hereto as **Exhibit J**;

18        k.    <u>Sworn deposition testimony of C. Guildner</u>, pages 338-341 – A true and

19   accurate copy of this document is attached hereto as **Exhibit K**;

20        l.    <u>Osprey Special Risks, Ltd. Policy Schedule</u> – A true and accurate copy of this

21   document is attached hereto as **Exhibit L**;

22        m.    <u>Sworn deposition testimony of C. Guildner</u>, pages 418-421 – A true and

23   accurate copy of this document is attached hereto as **Exhibit M**;

24        n.    <u>Email from C. Guildner accompanying Osprey Policy</u> – A true and accurate

25

DECLARATION OF DANIEL BROWN IN SUPPORT OF
DEFENDANTS' SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT - 2
( C12-0939-RSL)

4357592.1

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

1   copy of this document is attached hereto as **Exhibit N**;

2       o.      Email from C. Guildner to M. Bell, June 25, 2012 – A true and accurate copy of

3   this document is attached hereto as **Exhibit O**;

4       p.      Sworn deposition testimony of C. Guildner, pages 42-45 – A true and accurate

5   copy of this document is attached hereto as **Exhibit P**;

6       q.      Sworn deposition testimony of D. Swift, pages 78-81 – A true and accurate

7   copy of this document is attached hereto as **Exhibit Q**;

8       r.      Sworn deposition testimony of C. Rees, pages 66-67 – A true and accurate copy

9   of this document is attached hereto as **Exhibit R**;

10      s.      Email from C. Rees to C. Staunton, June 17, 2012 – A true and accurate copy of

11  this email is attached hereto as **Exhibit S**;

12      t.      Sworn deposition testimony of C. Rees, page 92 – A true and accurate copy of

13  this document is attached hereto as **Exhibit T**;

14      u.      Sworn deposition testimony of C. Guildner, pages 150-153 – A true and

15  accurate copy of this document is attached hereto as **Exhibit U**;

16      v.      Email from P. Barratt to A. Olson and C. Rees, July 10, 2012 – A true and

17  accurate copy of this document is attached hereto as **Exhibit V**;

18      w.      Sworn deposition testimony of C. Guildner, pages 250-253 – A true and

19  accurate copy of this document is attached hereto as **Exhibit W**;

20      x.      Sworn deposition testimony of C. Guildner, pages 270-273 – A true and

21  accurate copy of this document is attached hereto as **Exhibit X**;

22      y.      Sworn deposition testimony of C. Guildner, pages 386-393, 394-397 – A true

23  and accurate copy of this document is attached hereto as **Exhibit Y**;

24      z.      Sworn deposition testimony of C. Guildner – A true and accurate copy of this

25

DECLARATION OF DANIEL BROWN IN SUPPORT OF
DEFENDANTS' SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT - 3
( C12-0939-RSL)

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, Washington 98101-2380
(206) 628-6600

4357592.1

1   document is attached hereto as **Exhibit Z**;

2       aa.    <u>Sworn deposition testimony of C. Guildner,</u> pages 374-377 – A true and

3   accurate copy of this document is attached hereto as Exhibit **AA**;

4       bb.    <u>Sworn deposition testimony of C. Guildner</u> – A true and accurate copy of this

5   document is attached hereto as Exhibit **BB**; and

6       cc.    <u>Email from C. Guildner to P. Barratt,</u> March 8, 2012 – A true and accurate copy

7   of this document is attached hereto as Exhibit **CC**.

8       I have read the foregoing statement and declare under penalty of perjury under the laws

9   of the State of Washington and the United States of America that the above statement is true

10  and correct.

11      RESPECTFULLY SUBMITTED this ____ day of October, 2013, at Seattle, WA:

12

13                                  /s/ Daniel A. Brown_____
                                    Daniel A. Brown
14                                  WSBA #22028

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF DANIEL BROWN IN SUPPORT OF          **Williams, Kastner & Gibbs PLLC**
DEFENDANTS' SECOND MOTION FOR PARTIAL SUMMARY      601 Union Street, Suite 4100
JUDGMENT - 4                                        Seattle, Washington 98101-2380
( C12-0939-RSL)                                     (206) 628-6600

4357592.1

# EXHIBIT A

# Marine Internal Evaluation

| | |
|---|---|
| Today's Date: | 02.10.11 |
| Prepared by: | Dyan Swift |
| Loan Number: | 5033472-201 |
| Borrower: | Bluewater Cruising, LLC |

**Purpose:**

| | |
|---|---|
| Special Assets work-out or modification | X |
| Renewal, extension, or bridge loan conversion | |
| Internal review | |

**Collateral**

| | |
|---|---|
| Vessel Description | 1990 Custom 51 Avatar |
| Vessel Name | Leviathan |
| Location of Moorage | Seaview East Boatyard |
| Hull Identification Number | AVA51 |
| Official Number | 950894 |
| Original Purchase Price | $    378,000 |
| Original Survey Date | 09.27.05 |
| Original Survey Fair Market Value | $    360,000.00 |
| Original Overall Vessel Condition | Average |

**Yacht World Comparable Listing Information**

| | |
|---|---|
| Search parameters: | N/A - unable to locate in Yacht World |
| Total number of North America listings | |
| Total number of Pacific Northwest listings | |
| Highest List Price | |
| Lowest List Price | |
| Average List Price - North America | |
| Average List Price - Pacific Northwest | |
| Ideal List Price | $    360,000 |
| Estimated Sales Discount to List Price | 90% |
| **Estimated Value** | $    324,000 |

**Comments**

Custom yacht built in 1990 with no available comps.  Vessel is in good
working condition and has been well-maintained.  Despite lack of comps,
the vessel has a strong marketability and would not have difficulty selling.
Survey from 2006 shows a value of $360k which remains a logical value
for this vessel.  Estimated value shows a 10% discount to allow for selling
negotiations.

| | |
|---|---|
| Reviewed by: | |
| Review date: | 2-10-11 |
| Approved by: | |
| Approval Date: | |

EXHIBIT 20
WITNESS M. Cullen
DATE 10/3/13

PB000075

# EXHIBIT B

## Marine Internal Evaluation

| | |
|---|---|
| Today's Date: | 01.18.12 |
| Prepared by: | Dyan Swift |
| Loan Number: | 5033472-201 |
| Borrower: | Bluewater Cruising, LLC |

**Purpose:**

| | |
|---|---|
| Special Assets work-out or modification | X |
| Renewal, extension, or bridge loan conversion | |
| Internal review | |

**Collateral**

| | |
|---|---|
| Vessel Description | 1990 Custom 51 Avatar |
| Vessel Name | Leviathan |
| Location of Moorage | ~~Seaview East Boatyard~~  *Open NZ* |
| Hull Identification Number | AVA51 |
| Official Number | 950894 |
| Original Purchase Price | $    378,000 |
| Original Survey Date | 09.27.05 |
| Original Survey Fair Market Value | $    360,000.00 |
| Original Overall Vessel Condition | Average |

**Yacht World Comparable Listing Information**

| | |
|---|---|
| Search parameters: | N/A - unable to locate in Yacht World |
| Total number of North America listings | |
| Total number of Pacific Northwest listings | |
| Highest List Price | |
| Lowest List Price | |
| Average List Price - North America | |
| Average List Price - Pacific Northwest | |
| Ideal List Price | $    360,000 |
| Estimated Sales Discount to List Price | 90% |
| **Estimated Value** | $    324,000 |

*< 25,000 >  259,000*

*shipping from NZ if we have to close*

**Comments**

Custom yacht built in 1990 with no available comps. Vessel is in good working condition and has been well-maintained. Despite lack of comps, the vessel has a strong marketability and would not have difficulty selling. Survey from 2006 shows a value of $360k which remains a logical value for this vessel. Estimated value shows a 10% discount to allow for selling negotiations.

| | |
|---|---|
| Reviewed by: | |
| Review date: | 1.18.12 |
| Approved by: | |
| Approval Date: | |

EXHIBIT 32
WITNESS Guilder
DATE 10/7/11

# EXHIBIT C

| | |
|---|---|
| **From:** | Amber Olson |
| **To:** | Charlie Guildner; Dyan Swift |
| **Sent:** | 4/18/2012 9:02:58 AM |
| **Subject:** | RE: MaaMalni |

Nicely done! I bet we'll get some prompt action now!  J

---

**From:** Charlie Guildner
**Sent:** Tuesday, April 17, 2012 4:58 PM
**To:** Dyan Swift
**Cc:** Amber Olson
**Subject:** Re: MaaMalni

Stan concurred.

Sent from my iPad

On Apr 17, 2012, at 4:54 PM, "Dyan Swift" <Dyan.Swift@peoplesbank-wa.com> wrote:

I say walk the plank as well.  Fire under their backside to get their affairs in order and pay us off.

---

**From:** Charlie Guildner
**Sent:** Tuesday, April 17, 2012 4:41 PM
**To:** Amber Olson; Dyan Swift
**Subject:** Fwd: MaaMalni

Kick em off the boat or let them stay?  I say they walk the plank.

Sent from my iPad

Begin forwarded message:

**From:** Pauline Barratt <Pauline.Barratt@jonesfee.com>
**Date:** April 17, 2012 3:19:48 PM PDT
**To:** Charlie Guildner <Charlie.Guildner@peoplesbank-wa.com>, <stan@loosmore.com>
**Subject:** MaaMalni

EXHIBIT 40
WITNESS Guilder
DATE 10/3/1

Redacted

# EXHIBIT D

Charles Guildner                                                October 7, 2013

<table>
<tr><td>

**Page 158**

1  me an example.
2      A.  Dinghies, motors, anchors, sails,
3  anything of value to the vessel.
4      Q.  How about, were you afraid they were
5  going to sell the bowsprit, B-O-W-S-P-R-I-T?
6      A.  I don't know that this boat has one.
7      Q.  Mast, were you afraid they were going
8  to sell the mast somehow?
9      A.  Probably not.
10     Q.  The boat itself?
11     A.  No.
12     Q.  Anchors?
13     A.  Yes.
14     Q.  You said that.
15        Cables?
16     A.  Potentially.
17     Q.  Chains?
18     A.  Yes.
19     Q.  Rigging?
20     A.  Yes.
21     Q.  Tackle?
22     A.  Yes.
23     Q.  Those are necessaries pertaining to the
24  boats.  What else was covered by your security
25  interest in your mind?

</td><td>

**Page 160**

1      A.  No.
2      Q.  Pots and pans?
3      A.  I don't know.
4      Q.  Can you actually tell me any list of
5  things that were covered by the mortgage sitting here
6  today besides the thing I just read you from the
7  mortgage?
8      A.  No.
9      Q.  Okay.  If I went through a whole list
10  of items that I can imagine are on that boat, in
11  fact, we have a whole list of items our clients are
12  contending, would you be able to tell me on any of
13  those items that they belong to the mortgage and are
14  covered by mortgage or were not, could you tell me
15  that?
16     A.  No.
17     Q.  So basically the chief credit officer,
18  the head of the SAD group, couldn't tell me what was
19  covered by your own mortgage at this point; is that
20  fair to say?
21     A.  Yes.
22     Q.  Did the bank take possession of a whole
23  bunch of items on the boat?
24     A.  The bank took possession of the boat
25  and everything that was in it.

</td></tr>
<tr><td>

**Page 159**

1        MS. CARR:  Objection, calls for a legal
2  conclusion.
3      A.  I don't know.
4      Q.  You have no idea sitting here what was
5  covered by your own security instrument; is that what
6  you're telling me?
7      A.  I don't know all of the specific items
8  that were on this particular boat.  The items that
9  you're telling me are discussed in the mortgage.
10     Q.  I agree with that.  I wanted to know
11  what else you think was covered by the mortgage.
12  Inflatable kayak, inflatable kayak on there, you can
13  blow it up, go kayaking, was that covered by your
14  mortgage?
15     A.  I don't know.
16     Q.  My clothes, is that covered by your
17  mortgage?
18     A.  No.
19     Q.  Food in the cabinets, covered by the
20  mortgage?
21     A.  I don't know.
22     Q.  Clothes not, food maybe?
23     A.  I don't know.
24     Q.  Well, you said no on clothes, you know
25  that's for certain.  But food, you don't know?

</td><td>

**Page 161**

1      Q.  Right, and because you escorted the
2  clients out, the debtors out of their boat, the
3  owners of the boat and then you said let them walk
4  the plank, wouldn't let them on at that point, they
5  weren't going to get anything off at that point, were
6  they?
7      A.  No.
8      Q.  So at that point, you were taking
9  possession of not only the boat, you were taking
10  possession of everything on there that they didn't
11  walk out of there with on that first day; is that
12  fair to say?
13     A.  Yes.
14     Q.  Okay, and you had an understanding that
15  after arresting the vessel officially and they were
16  off the boat, they couldn't get back on the boat
17  without your permission or an order of the court,
18  correct?
19     A.  That's my understanding, yes.
20     Q.  Okay.  During the next couple of weeks
21  after the seizure of the boat, there was an attempt
22  to negotiate a resolution of this matter, wasn't
23  this?
24     A.  Yes.
25     Q.  And that was handled by counsel for the

</td></tr>
</table>

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110      FAX: 206.622.6236

# EXHIBIT E

My client may be amenable to signing a Bill of Sale in the form suggested by your client, in order to assist 'fill the gaps' in the mortgage/promissory note, should your client be similarly amenable to assisting with the items in contention.

May we suggest that:

1. In that our client is presently in NZ would it not be possible/easier for a representative of your client to attend to an inspection/negotiation this week (I would be more than happy to meet with all parties onboard the vessel to hammer this out); If this is impossible
2. We are instructed that amongst Mr Bell's China and personal items are a number of family heirlooms that have been in Mr Bell's family for 45 years;
3. We are further instructed that Mr Bell is a builder/house remodeler and the tools represent a list of the tools of his trade;
4. We note that your client will be arranging for its own representative to ascertain what is personal and/or should belong to the vessel however, given the above points 2 and 3 we do not consider that a purely subjective inspection by a representative of your client will be reasonable;
5. As such can you confirm what involvement my client/we will have in negotiating/determining the outstanding items and who/how the outstanding items will be held by?

Peter will call you in the morning to discuss further.

We look forward to your urgent response.

Kind regards

**Forrester Grant**
**Staff Solicitor**
**Dawson & Associates Limited**
Maritime & Commercial Lawyers
m 021 778 989 | p +64 3 544 1967 | f +64 3 544 1968 | skype Forrestergrantnz www.dawsonlaw.co.nz

This communication is confidential and may be legally privileged.  If you are not the intended recipient, please delete this email and notify us promptly.

---

**From:** Pauline Barratt [mailto:Pauline.Barratt@jonesfee.com]
**Sent:** Tuesday, 22 May 2012 11:39 a.m.
**To:** Forrester Grant
**Cc:** Peter Dawson
**Subject:** RE: Nettleship – Maamalni

Dear Forrester

I now have instructions.

My client will consent to the removal from the vessel of the following items:

From Ms Nettleship's Personal Inventory list she can remove:

All in the Clothing Category
All in the Cosmetics and Toiletries Category
From Sporting Goods her personal dive gear but not the kayak or the binoculars.
All from Electronics
All from Artwork and Photographs

EXHIBIT 42
WITNESS
DATE

PB000363

All from Office Supplies
All from Medical
All from Personal Papers
All from Miscellaneous
All from Sundries

The China, Soft Goods, Cookware, Personal Safety gear and Tools remain with the vessel.

From Michael Bell's Property List he can remove the following:

All from Clothing
From Sports Gear ONLY the Dive gear
All from Artwork
All from DVD's CD's
All from Electronics EXCEPT the Barometer
All from Office Supplies
All from Personal Papers
From Miscellaneous all except Barometer, Clock, Compass and Bell

The China, Cookware, Tools, Sailing Equipment, Personal Safety Gear, Soft Goods, Charts, and Sundries remain with the vessel. Also sports gear except the dive gear stays with the vessel.

It is a condition of consent that prior to Ms Nettleship and Mr Bell being allowed access to the vessel, that Bluewater Cruising executes a US bill of sale (which is being prepared and which I expect to receive shortly), has it properly executed and witnessed, and delivers it to me. Please note that this will require witnessing by a US notary – my client believes that there will be such a person at the US Consulate in Auckland.

In relation to the items to which my client is not giving consent to removal, it will arrange for its own representative to examine those to determine which can properly be regarded as personal and which ought to be treated as belonging with the vessel. The items which are considered as personal will be shipped to the Bank in the US, at the Bank's expense, and will be able to be collected from there by Ms Nettleship and Mr Bell.

Please confirm.

Kind regards
Pauline Barratt | Partner | DDI +64 9 373 0055 | Skype pauline.barratt1

Also admitted to the Supreme Court of Samoa

---

**From:** Forrester Grant [mailto:forrester@dawsonlaw.co.nz]
**Sent:** Tuesday, 22 May 2012 9:09 a.m.
**To:** Pauline Barratt
**Cc:** Peter Dawson
**Subject:** FW: Nettleship - Maamalni
**Importance:** High

Good morning Pauline,

Just a brief email to enquire as to whether you have had an opportunity to discuss Peter's initial email and my subsequent email (set out below for your ease of reference) with your client.

PB000364

# EXHIBIT F

WHEN RECORDED RETURN TO

MARINE DOCUMENTATION SERVICE, INC
212 COMMERCIAL AVE
ANACORTES, WA  98221
(360) 299-3272

## SATISFACTION OF MORTGAGE

Peoples Bank (Mortgagee) does hereby certify the below indicated Preferred Mortgage has been paid and I hereby consent that the same be discharged of record.

Vessel Name: MAAMALNI        Official No.: 950894

Mortgagor:   Bluewater Cruising LLC

Amount:      $329,300.00

Batch:       482997          Doc ID:   5316337

Date:        25 APR 06       Time:     08/30 AM

Date: 7/19/12

_____ _Peoples Bank_
(Signature and title of Mortgagee)

### NOTARY ACKNOWLEDGMENT

STATE OF Washington }

COUNTY OF Whatcom }

I certify that I know or have satisfactory evidence that _Charles Guildner_ signed this instrument,
                                                              (name)
on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the

_Executive VP_ of _Peoples Bank_ to be the free and
(officer, trustee, etc)        (institution or lender)

voluntary act and deed of such party for the uses and purposes therein mentioned.

Dated: July 19, 2012

_____
Notary Public in and for the State of WA
residing at: Bellingham
My commission expires) 3.24.16

EXHIBIT 48
WITNESS
DATE

12402

PB000041

# EXHIBIT G

**Christine Bird**

| | |
|---|---|
| From: | Charlie Guildner [Charlie.Guildner@peoplesbank-wa.com] |
| Sent: | Wednesday, 20 June 2012 5:29 a.m. |
| To: | Christine Bird |
| Subject: | RE: MaaMalni |
| Attachments: | Image001.jpg |

I agree with all of your suggestions as to their personal gear.  If it is not mounted and adds nothing to the boat value included it in the boxes to ship to me.  The spec sheet looks great.  Thanks for all of your assistance.  I will wait to hear the engineers report.

For shipping, please send the personal effects via a reasonably priced shipping method to:

Peoples Bank
c/o Charlie Guildner
3100 Woburn Street
Bellingham WA USA 98226

---

From: Christine Bird [mailto:Christine@busfieldmarine.co.nz]
Sent: Sunday, June 17, 2012 9:52 PM
To: Charlie Guildner
Subject: MaaMalni

Hi Charlie

Just to up-date you on MaaMalni – the engineer has been onboard and I am hoping to get a full written report from him tomorrow but I understand that most things ran up OK. The most notable exceptions were the bow thruster – there is no motor in the unit, the Eberspacher heating did not seem to function and there is a problem with the engine instrument panel – no alarms or rev counter.

In terms of the contentious items I have gone through the boxes and taken out the cruising guides and other books that relate to sailing and maintenance onboard – some fantastic reference books there. I have stowed the charts, sewing machine, personal EPIRBS, life jackets & fishing gear back in lockers as well. The Le crueset pot, thermometer and a few other cooking things are still boxed up. There is enough cooking equipment onboard and most of the things they wanted are pretty old and of no real value to the boat. The fishing club is a carved one probably bought on some pacific island so of personal value but little else so have boxed that up to go as well. The assorted sewing gear and bell are really of no value and I cannot see where the bell was originally mounted so am happy to be guided by you.

Apart from that those items which make up about 2.5 boxes there is only the following:
1 bag of clothes
3 dozen or so bottles of herbal supplements
Assorted sunglasses & reading glasses

There are 2 sets of clock and barometer – one of which was with the gear that the owners wanted and again cannot see where it was originally mounted so thought to include this in their gear but again am happy not to if you prefer.

I have five huge bags of rubbish that I have filled from clearing away all the clutter in lockers etc as well as half a dozen boxes of food to go up to the City Mission. It was a miserable day here today so hopefully tomorrow is better and I can get these off the boat.

PB002092

The boat is filthy, especially the galley and aft head so will get someone onboard to give it a clean as soon as it is clear of all rubbish.

Once I have the engineer's report and we make a plan of what to fix and what to ignore then I will let you know how much you need to send to us to cover this.

I have attached the spec sheet for your information. So far we have sent it out to some 30 or so old clients as well as 3 new ones from our internet advertising. The engineer and I shifted her over to the sales berth yesterday and already one person has been in enquiring about her so let's hope she draws some genuine buyers sooner rather than later.

I think that covers everything for now.

Let me know your thoughts.

Kind regards
Christine

*Christine Bird*
*Sales Manager/Yacht Broker*
Mobile: 0210220 5398



PO Box 90-141, Victoria Street West, Auckland 1142
23B Westhaven Drive, Auckland.
Tel: 09 302 0220  Fax: 09 366 1734

Confidentiality Notice:
Unless otherwise indicated, email transmission is not a secure form of communication and your reply may not be encrypted. The information contained in this message is proprietary and/or confidential. If you are not the intended recipient, please: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.
Thank you

PR002093

# EXHIBIT H

Brown

CopyReceived

JUN 1 8 2013

WILLIAMS KASTNER
SEATTLE
TIME RECEIVED: 10:40

The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| PEOPLES BANK, a Washington corporation,<br><br>Plaintiff,<br><br>v.<br><br>BLUEWATER CRUISING LLC, a Nevada limited liability company, and SUZAN NETTLESHIP, *In Personam*,<br><br>Defendants. | IN ADMIRALTY<br><br>NO. C12-0939-RSL<br><br>**PLAINTIFF'S SUPPLEMENTAL ANSWERS** TO DEFENDANTS' FRIST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS |

TO:        Defendants

AND TO:    Daniel A. Brown, Williams, Kastner & Gibbs, their attorneys.


## SUPPLEMENTAL ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify all Peoples Bank employees involved directly or indirectly in the Arrest/Sale of S/V Maamalni, and for each person identify:

(a)    The date(s) such person(s) was/were employed by Peoples Bank;

(b)    The duties such person/persons performed at the time of the Arrest/Sale;

(c)    The action(s) that each person/persons took relating to the Arrest/Sale;

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

(d)    Who each person's supervisor was at the time of the Arrest/Sale; and

(e)    Any and all document prepared by any such persons pertaining to the Arrest/Sale of the S/V Maamalni.

**SUPPLEMENTAL ANSWER:**

Charlie Guildner, Executive Vice President/Chief Credit Officer

    (a) Still employed by Peoples Bank.

    (b) Manages all aspects of lending.  His primary duties include underwriting,

        approval, valuations, problem loan management, and Other Real Estate

        Owned ("OREO") disposition.

    (c) Primary officer and decision-maker on Ms. Nettleship's account.  Maintained

        all contact with attorneys and broker, signed affidavits and other legal

        documents pertaining to legal action, primary contact for borrower, listed

        boat, and signed Purchase and Sale Agreement ("PSA") to buyer.

    (d) Russell A. Lee.

Amber Olson, Vice President/Special Assets & Credit Risk Manager

    (a) Still employed by Peoples Bank.

    (b) Manages special assets and credit risks.  Her primary duties include the

        disposition of OREO, problem loan workouts, credit reviews, and loan

        portfolio reporting.

    (c) Secondary officer on Ms. Nettleship's account after arrest.  She was copied on

        communications from Mr. Guildner.  Before the arrest she met with

        Mr. Guildner to discuss possible resolutions, e.g., workout ideas.  She assisted

PLAINTIFF'S SUPPLEMENTAL ANSWERS TO
DEFENDANTS' FRIST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS - 2
No. C12-0939-RSL

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

with obtaining insurance on the vessel for Peoples Bank, helped process the PSA, and facilitated closing by completing tasks such as providing wire instructions, collecting the signed bill of sale from and sending documents by overnight mail.

  (d) Charlie Guildner.

Dyan Smith, Special Assets Officer (1/2010 – 4/2012) and Credit Review Officer (4/2012 – present)

  (a) Still employed by Peoples Bank.

  (b) Completed workouts for problem loans and conducted credit reviews and evaluations.

  (c) Secondary officer on Ms. Nettleship's account until date of arrest.  After the arrest, he was copied on emails.  He met informally with Mr. Guildner to discuss how to proceed, e.g., workout ideas.

  (d) Amber Olson.

Carrie Roat, Collections Specialist

  (a) Still employed by Peoples Bank.

  (b) Collections and problem loan workouts.

  (c) Assisted with deficiency calculations and with obtaining insurance on the vessel for Peoples Bank.

  (d) Amber Olson.

(e) In response to subpart (e), see documents produced on the enclosed CD.

PLAINTIFF'S SUPPLEMENTAL ANSWERS TO
DEFENDANTS' FRIST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS - 3
NO. C12-0939-RSL

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

**INTERROGATORY NO. 2:** Identify all non-Peoples Bank individuals involved directly or indirectly in the Arrest/Sale of S/V Maamalni, and for each person identify:

      (a)      The employer of such person/persons;

      (b)      The action(s) that each person/persons took relating to the Arrest/Sale; and

      (c)      Any and all documents prepared by any such persons pertaining to the Arrest/Sale of the S/V Maamalni.

**SUPPLEMENTAL ANSWER:**

Stan Loosmore

      (a) Stan Loosmore, PS.

      (b) Mr. Loosmore is an attorney.  His actions relating to the arrest and sale of the vessel include working with Peoples Bank's attorney in New Zealand on the New Zealand legal action and filing the judgment in the United States.

Pauline Barratt

      (a) Jones Fee.

      (b) Ms. Barratt represented Peoples Bank in the New Zealand legal action undertaken to proceed with the arrest and sale.

Colin Rees

      (a) Busfield Marine.

      (b) Mr. Rees was a broker for the vessel.  Peoples Bank is aware of the following actions by Mr. Rees related to the sale of the vessel:  evaluated the fair market value of the vessel, recommended a list price, obtained the PSA from the

buyer and presented it to Peoples Bank for approval, and facilitated the

transfer of funds from the buyer to Peoples Bank.

Christine Bird

    (c) Busfield Marine.

    (d) Ms. Bird was a broker for the vessel and worked with Mr. Rees to determine

        the boat's value and perform the other tasks needed to complete the sale.

        Peoples Bank is aware of the following actions by Ms. Bird related to the sale

        of the vessel:  provided vessel comparisons, recommended a list price,

        obtained the PSA from the buyer and presented it to Peoples Bank for

        approval, facilitated the transfer of funds from the buyer to Peoples Bank, and

        facilitated a walk-through of the boat with an engineer and inventoried items

        on the boat.

Norm Havercroft

    (a) Marine Documentation Service, Inc.

    (b) People Bank is aware of the following actions by Mr. Havercroft related to the

        sale of the vessel:  prepared transfer documents.

Rich Haynie

    (a) Rich Haynie Insurance.

    (b) Mr. Haynie helped Plaintiff secure insurance on the vessel.

    (c) In response to subpart (c), see documents produced on the enclosed CD.

PLAINTIFF'S SUPPLEMENTAL ANSWERS TO
DEFENDANTS' FRIST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS - 5
NO. C12-0939-RSL

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

**INTERROGATORY NO. 5:** State whether any judicial process/action occurred in the New Zealand judicial system with regard to the Arrest/Sale of the S/V Maamalni, and for each process/action provide the following:

     (a)     The court or tribunal that such process/action took place in;

     (b)     The result of the process/action; and

     (c)     Identify any and all documents issued by the court or tribunal in relation to the process/action.

**SUPPLEMENTAL ANSWER:** Objection. Peoples Bank does not have this information. The burden on Ms. Nettleship to get this information from her attorney in New Zealand is no greater than it is for the bank to get it from its attorney, Ms. Barrett. Subject to this objection, Peoples Bank responds that the answer can be determined, pursuant to Rule 33, from court documents that will be produced when received from its New Zealand counsel.

**INTERROGATORY NO. 6:** State whether any appraisals were conducted of the S/V Maamalni after the arrest occurred on or around April 16, 2012 and, for each appraisal, provide the following information:

     (a)     The name of the appraisal company;

     (b)     The name of the appraiser(s);

     (c)     The appraised value of the S/V Maamalni;

     (d)     Identify any and all documents pertaining to the appraisal(s).

**SUPPLEMENTAL ANSWER:** If "appraisal" includes broker valuations made to determine a reasonable sale price, then, as stated in Plaintiff's March 29, 2013 response to this interrogatory, Peoples Bank "retained Mr. Colin Rees and Ms. Christine Bird of Busfield Marine

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

Brokers in Auckland, New Zealand to examine the vessel and appraise it." Plaintiff already

produced the listing prepared by Busfield Marine as a result of its inspection and valuation. No

formal written appraisal was prepared, to the Bank's knowledge.

**INTERROGATORY NO. 12:** State the actions, if any, that Peoples Bank took to place

Defendants on notice regarding their rights to redeem or otherwise be made aware of the

disposition of the S/V Maamalni as collateral on the underlying debt.

**SUPPLEMENTAL ANSWER:** As stated in Plaintiff's March 29, 2013 response to this

interrogatory, Peoples Bank objects because this interrogatory assumes that defendants had

"rights to redeem or otherwise be made aware of the disposition of the S/V Maamalni."

**INTERROGATORY NO. 13:** Explain in detail why Peoples Bank denies paragraph 33

of the Defendants' Amended Answer and Counterclaims, as indicated by ¶2 of the Plaintiff's

Answer to Counterclaims dated February 7, 2013.

**SUPPLEMENTAL ANSWER:** See answer to Interrogatory No. 6. The boat's fair

market value was determined by a very experienced broker, taking into account recent sales of

similar vessels, the market for such vessels, and the condition of the vessel.

**INTERROGATORY NO. 14:** Explain in detail why Peoples Bank denies paragraph 39

of the Defendants' Amended Answer and Counterclaims, as indicated by ¶8 of the Plaintiff's

Answer to Counterclaims dated February 7, 2013.

**SUPPLEMENTAL ANSWER:** The voluntary signing and delivery of the Bill of Sale

by Defendants was accepted by Plaintiff as an alternative to the bank pursuing all its remedies in

the New Zealand lawsuit, not as an alternative to a deficiency action in the United States.

PLAINTIFF'S SUPPLEMENTAL ANSWERS TO
DEFENDANTS' FRIST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS - 7
No. C12-0939-RSL

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

**SUPPLEMENTAL RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 4:**  Produce each and every document submitted to or issued from any New Zealand court or tribunal in relation to the process/action pertaining to the Arrest/Sale of the S/V Maamalni.  Please note that this is the companion Request for Production to Interrogatory 5(c).

**SUPPLEMENTAL RESPONSE:**  Plaintiff believes Defendants have equal access to New Zealand court records through their New Zealand counsel, but Plaintiff has requested the records from its New Zealand counsel and will produce them upon receipt.

**REQUEST FOR PRODUCTION NO. 5:**  Produce each and every document pertaining to the appraisal(s) of the S/V Maamalni conducted after the arrest occurred on or around April 16, 2012.  Please note that this is the companion Request for Production to Interrogatory No. 6(d).

**SUPPLEMENTAL RESPONSE:**  There was no formal written appraisal.  See response to Interrogatory No 6.

**REQUEST FOR PRODUCTION NO. 8:**  Produce each and every document pertaining to the listing of the S/V Maamalni after the arrest, communications to and from potential or future buyer(s) of the S/V Maamalni, and all documents that relate to your attempts to obtain the best price possible in any such sale of the S/V Maamalni.

**SUPPLEMENTAL RESPONSE:**  See documents produced on the enclosed CD.

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

DATED this 17th day of June, 2013.

**GORDON TILDEN THOMAS & CORDELL** LLP
Attorneys for Peoples Bank

By _____
Michael Rosenberger, WSBA #17730
Susannah C. Carr, WSBA #38475
1001 Fourth Avenue, Suite 4000
Seattle, Washington 98154
Telephone: (206) 467-6477
Facsimile:  (206) 467-6292
Email:  mrosenberger@gordontilden.com
Email:  scarr@gordontilden.com

PLAINTIFF'S SUPPLEMENTAL ANSWERS TO
DEFENDANTS' FRIST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS - 9
No. C12-0939-RSL

**VERIFICATION**

STATE OF _____ )
                          ) ss.
COUNTY OF _____ )


_____, being first duly sworn on oath, deposes and says:

I am the _____ of Peoples Bank, the above named Plaintiff, and I am authorized to make this verification for and on behalf of said Plaintiff.  I have read the within and foregoing supplemental answers/responses to Defendant's First Interrogatories and Requests for Production to plaintiff Peoples Bank, know the contents thereof, and believe the same to be true.


_____

[PRINT NAME]_____

SUBSCRIBED AND SWORN to before me this _____ day of _____, 2013.


_____

[PRINT NAME]_____
NOTARY PUBLIC for the State
  of _____,
Residing at _____
My Commission Expires: _____

PLAINTIFF'S SUPPLEMENTAL ANSWERS TO
DEFENDANTS' FRIST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS - 10
NO. C12-0939-RSL

GORDON TILDEN THOMAS & CORDELL, LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

1
2

## DECLARATION OF SERVICE

3

The undersigned declares under penalty of perjury under the laws of the State of

4
5

Washington that I caused a true and correct copy of this document to be delivered via email on

6
7

June 17, 2013, and via hand delivery on June 18, 2013, to counsel for defendants:

8
9          Daniel A. Brown
10         Williams, Kastner & Gibbs PLLC
11         601 Union Street, Suite 4100
12         Seattle, WA  98101-2380
13         dbrown@williamskastner.com
14
15
16
17         Carol Hudson, Legal Secretary
18         Gordon Tilden Thomas & Cordell LLP
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

PLAINTIFF'S SUPPLEMENTAL ANSWERS TO
DEFENDANTS' FRIST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS - 11
No. C12-0939-RSL

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

# EXHIBIT I

**Colin Rees**

| | |
|---|---|
| **From:** | Colin Rees |
| **Sent:** | Monday, 25 June 2012 9:31 a.m. |
| **To:** | cjstaunton@gmail.com |
| **Subject:** | Maamaini |
| **Attachments:** | Busfield Marine Brokers Limited Bank details.pdf |

Hi Craig and Carey

We have been told we should have the signed contract later today, so all is on track.
I will forward this on as soon as we get it.

Attached are our client account details for the deposit. On receiving the signed contract, this should be paid.

We have had a huge response on Maamaini and this should be really reassuring for you as the buyers and I wish we had ten of them to sell!

Will be in touch.

Colin
**Colin Rees**
YACHT BROKER
Mobile: 029 9691221



*23B Westhaven Drive*
*Auckland*
*New Zealand*
64 9 3021220

1

PB002203

# EXHIBIT J

**Christine Bird**

From: Charlie Guildner [Charlie.Guildner@peoplesbank-wa.com]
Sent: Friday, 22 June 2012 2:45 a.m.
To: Christine Bird
Subject: RE: MaaMalni

Wow, that was fast. Almost too fast.  Considering the short time on the market I think we should accept with a minor counter that the price be $269k plus the GST.  Your thoughts?

-----Original Message-----
From: Christine Bird [mailto:Christine@busfieldmarine.co.nz]
Sent: Wednesday, June 20, 2012 6:38 PM
To: Charlie Guildner
Cc: Colin Rees
Subject: MaaMalni

Hi Charlie

My colleague broker Colin Rees has had an offer of the asking price for MaaMalni from a previous client of his. This is subject to the Purchasers obtaining suitable finance by the 26th of June as well as the usual survey & sea trial clauses. I have attached the contract signed by them for you. If you are happy with this please return this with your signature on all pages. Many thanks. Please give me a call if there is anything you would like to discuss.

Kind regards
Christine

Christine Bird
Sales Manager/Yacht Broker
Mobile: 021 0220 5398

PO Box 90-141, Victoria Street West, Auckland 1142 23B Westhaven Drive, Auckland
Tel: 09 302 1220   Fax: 09 366 1734

Confidentiality Notice:

Unless otherwise indicated, email transmission is not a secure form of communication and your reply may not be encrypted. The information contained in this message is proprietary and/or confidential. If you are not the intended recipient, please: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

Thank you

1

PB002094

# EXHIBIT K

Charles Guildner                                          October 7, 2013

---

Page 338

1   pretty good question.  I don't defend my questions
2   that often, but I think that was a good one.
3          A.  That's okay.
4          Q.  Do you recall having communications
5   with Busfield personnel after signing the agreement
6   to list and before the boat was under contract about
7   the status?
8          A.  Yes.
9          Q.  What do you recall about that?
10         A.  What I recall after having read the
11  emails from last week --
12         Q.  Stop right there.  Before that, then,
13  before you read those, would you have any
14  recollection?
15         A.  No.
16         Q.  Perfect.
17             Now, what do you recall from reading
18  those documents?  Go ahead.
19         A.  Right, that the boat sold very quickly
20  and that I was surprised based upon what I had been
21  told by the brokers of the condition of the market
22  there.
23         Q.  It sold so quickly you were concerned
24  that it was underpriced?
25         A.  Slightly, yeah.

---

Page 339

1          Q.  If somebody told you it was a pretty
2   soft market, it's going to take a while, and then
3   they sell it in a few days, you realize maybe we
4   didn't have the market quite tagged with the price,
5   correct?
6          A.  And I recall --
7          Q.  Right?
8          A.  Right, and I recall attempting to try
9   and figure out a way to potentially get more for it.
10         Q.  You countered the Stantons saying let's
11  put the 15 percent back on them, correct?
12         A.  Correct.
13         Q.  Before that, they had given you a full
14  price offer, correct?
15         A.  Correct.
16         Q.  And after the counter in which you
17  added 15 percent back to the price, so to speak,
18  would you agree, you added 15 percent onto the price?
19         A.  Yes.
20         Q.  They accepted that full price too,
21  didn't they?
22         A.  No.
23         Q.  They haggled with you on that?
24         A.  No.  What I recall is that because the
25  listing included GST in it, that we couldn't counter

---

Page 340

1   higher and ask them to pay above the actual offered
2   list price including GST.
3          Q.  Who told you that?
4          A.  Christine.
5          Q.  Okay.  You specifically recall that?
6          A.  I recall it after having read an email
7   last week.
8          Q.  So you think there's an email where she
9   told you we can't do this, we can't put the 15
10  percent back on the buyer?
11         A.  Correct.
12         Q.  Okay.  I haven't seen that email.  You
13  produced it to your counsel obviously, correct?
14         A.  Yeah, I thought so.
15         Q.  Because you reviewed it last week,
16  correct?
17         A.  I believe so.
18         Q.  Did you review them at counsel's office
19  or your office?
20         A.  Counsel's office.
21         Q.  Did you bring in a bunch of documents
22  to counsel's office, or did you wait and look at the
23  documents they had there?
24         A.  I looked at a document that they had
25  there.

---

Page 341

1          Q.  So clearly it was in counsel's
2   possession, and maybe still in the bank's possession,
3   but you did not bring it with you, did you?
4          A.  I did not bring it with me.
5          Q.  So we're going to come back to that
6   again, but just to get your testimony straight here,
7   the listing was made and within days there was an
8   acceptance of full price as listed, correct?
9          A.  Correct.
10         Q.  You said whoops, that's a little fast,
11  can we do something about this?  And you came back
12  with the idea, let's counter with them paying the 15
13  percent on top?
14         A.  Yes.
15         Q.  Instead of you paying the 15 percent on
16  the bottom, correct?
17         A.  Yes.
18         Q.  And Christine said we can't do that?
19         A.  That's what I recall, yes.
20         Q.  So when the buyers wrote up their offer
21  to you, they wrote the offer to you, didn't they?
22         A.  They --
23         Q.  They wrote a purchase and sale offer to
24  the bank?
25         A.  Yes.

---

86 (Pages 338 to 341)

# EXHIBIT L



# OSPREY
## SPECIAL RISKS LIMITED

5 & 6 Dalesway House,
South Hawksworth Street,
Ilkley, West Yorkshire, LS29 9LA
Tel:          +44 (0) 1943 811000
Fax:          +44 (0) 1943 601854

### Policy Schedule
Policy No: OSPYP/137386

July 12, 2012

| Assured: | Assured's Agent: |
|---|---|
| Peoples Bank | Jardine Lloyd Thompson Limited |
| 3100 Woburn | 6 Crutched Friars |
| Bellingham | London |
| WA 98226 | EC2N 2PH |
| USA | |

| Vessel Name: | Maamalni | Model: | Auxiliary Sail |
|---|---|---|---|
| Year Built: | 1989 | Maker: | Avatar Yachts |
| ID Number: | AVA51 | Length: | 52 |
| Engines: | Diesel | Type: | Perkins 84hp |

**Period of Cover:** From June 25, 2012 00.01 LST to June 25, 2013 00.01 LST

**Cover and Respective Insured Limits:**

| Section: | Sum Insured: | | Deductible: |
|---|---|---|---|
| A.Hull | US$ 269,000 | | US$ 10,760 |
| Tender | Not Covered | | |
| B. Third Party Liability | US$ 1,000,000 | CSL | US$ 500 |
| Crew Liability Extension | Not Covered | | |
| C. Medical Payments | US$ 10,000 | | US$ 100 |
| D. Uninsured Boaters | US$ 269,000 | | |
| E. Trailer | Not Covered | | |
| F. Personal Property | Not Covered | | |

**Total Premium:** US$ 3,297.00 C.R.O + US$ 35.00 Certificate Fee.

In the event of cancellation by you a minimum of 25% of premium deemed earned. All fees earned at inception.

EXHIBIT _____ 67
WITNESS _____
DATE _____

Continuation Policy Schedule for Policy No: OSPYP/137386 : Page 2

| | |
|---|---|
| **Named Operators:** | Colin Rees |
| **Laid Up Period:** | None. |
| **Navigational Limits:** | Noted & agreed that the scheduled vessel is for sale & will be kept at Westhaven Marina, 23b Westhaven Dr, Aukland 1010, New Zealand. Navigation is confined to demonstration trips for prospective buyers within a maximum three mile radius of Westhaven Marina. |
| **Insuring Agreement Wording:** | As per SYP/7/PPO. |
| **Additional Warranties, Terms and Conditions:** | Excludes liability to persons working on or around the vessel. |

**Insurer/Security as approved and agreed by you:**

| | |
|---|---|
| **Section A, C & D:** | 100% Great Lakes Reinsurance (UK) PLC |
| **Section B:** | 100% Great Lakes Reinsurance (UK) PLC |

**Premium break-down by Insurers:**
Great Lakes Reinsurance (UK) PLC                              US$ 3,297

| | |
|---|---|
| **Loss Payee:** | Assured |

| | |
|---|---|
| **Date:** | Thursday, July 12, 2012 |

For and on behalf of Participating Underwriters/Insurers

For information regarding Osprey Special Risks Ltd, policy wordings, endorsement wordings, standard forms & frequently asked questions please see our website www.osprey-uwr.co.uk.

# PRIVATE AND PLEASURE YACHT INSURING AGREEMENT

## 1. DEFINITIONS

a) 'You and your' refer to the insured named on the declaration page and any person who possesses any legal or beneficial interest in any corporation, trust or entity either declared as the owner of the Scheduled Vessel or as an additional assured.

b) 'We, us and our' refer to the insurers named on the declaration page or accompanying schedule of insurers.

c) 'Covered person' means you, and/or any person detailed on your application form which has been submitted by you and approved by us, provided that person has been declared to us as an operator of the Scheduled Vessel.

d) 'Scheduled Vessel' means the vessel described on the declaration page, including machinery, electrical equipment, sails, masts, spars, rigging, and all other equipment normally required for the operation and maintenance of the vessel and situate on the Scheduled Vessel, which would normally be sold with the vessel. This does not include spare parts of the Scheduled Vessel, the Scheduled Vessel's life raft, tender or dinghy, unless the same has been declared on the declaration page, nor does it include any items being stored on premises other than onboard the Scheduled Vessel.

e) 'Trailer' refers to the Scheduled Vessel's trailer, used exclusively for that purpose.

f) Words of a masculine gender are deemed to encompass the female gender and vice versa. Words in the singular are deemed to encompass the plural and vice versa.

g) 'Navigational limits' means all waters as limited and shown on the declaration page unless mutually agreed by us and amended in writing.

h) 'Salvage charges' means those reasonable charges and expenses which are incurred by you if necessary to prevent damage, injury or loss of life or to prevent or minimise any further loss or damage covered by Section A of your insuring agreement.

i) 'Deductible' is the first amount of any claim, which must be paid by you. If a deductible is applicable to any section of your insuring agreement the amount will be shown on the declaration page and this amount will be deducted from the amount payable on each admissible claim.

j) 'Bodily injury/property damage' means bodily injury or property damage occurring during the period of this insuring agreement arising from ownership and/or use of the Scheduled Vessel.

k) 'Seaworthy' means fit for the Scheduled Vessel's intended purpose. Seaworthiness applies not only to the physical condition of the hull, but to all its parts, equipment and gear and includes the responsibility of assigning an adequate crew. For the Scheduled Vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its intended use.

l) 'Family' means any person related to you by blood, marriage or adoption, including wards and foster children.

m) 'Personal Property' means property purchased and owned by you, any covered person, any member of your family, provided that such property is situated on the vessel insured hereunder at the time of the loss, excluding any item that is deemed to be part of the Scheduled Vessel as defined in (d) above.

n) 'Race or speed trial' means any event involving speed and/or of a competitive nature, including, but not limited to, Regattas and/or Rallies. 'Preparing for a race or speed trial' means any navigation of the vessel necessary to ensure eligibility of either you or your vessel to participate in a race or speed trial.

SYP/7/PPO                                                                 Page 1 of 13

PB000146

o)   'Named Windstorm' damage is damage relating to or resulting from a named windstorm or any numbered tropical weather pattern from the time the named windstorm or numbered tropical weather pattern impacts the area and until 72 hours later. The area of the named windstorm or tropical weather pattern is an area encompassed by a circle of radius not exceeding 150 nautical miles from the path of the storm's forward travel.

p)   'Divers' means any person using underwater artificial breathing apparatus, and/or submersible mechanical or electrical device including, but not limited to, Submarines, Diving Bells and/or Diving Suits.

q)   'Operate, Operation, Operating' means to navigate or to be in physical control of or to be at the helm of the Scheduled Vessel.

r)   'Sinking' means when the vessel has sunk as far as is physically possible for the vessel to sink, and is totally submerged underwater.

s)   'Constructive' or 'Compromised' Total Loss means where we determine that either the reasonable cost of repairs exceed the sum insured, or where the net value being the sum insured, less the residual value of the Scheduled Vessel, is exceeded by or in our opinion is likely to be exceeded by the reasonable cost of repairs.

t)   'Agreed Value' means the sum insured under Section A of the insuring agreement declaration page or any endorsement to the same.

u)   'Combined Single Limit' (CSL) means the maximum amount we will pay towards any sum or sums that you or any other covered person become legally liable to pay and shall pay as a result of any one accident or occurrence arising from your operation of the Scheduled Vessel. If the insuring agreement declaration page shows multiple liability limits, the maximum amount we will pay in total in respect of any one accident or occurrence or series of accidents or occurrences arising from a single event, is limited to the amount shown as the Combined Single Limit irrespective of the number of claims or claimants arising from the said accident, occurrence or single event and in no circumstances shall there be any aggregation of liability limits shown on the insuring agreement declaration page in excess of the Combined Single Limit hereunder.

## 2. INSURING AGREEMENT

This is a legally binding insurance contract between you and us, incorporating in full the application form signed by you. We will provide the insurance coverage described in this insuring agreement, in return for payment to us of the premium due and compliance by covered persons with the provisions, conditions and warranties of this insuring agreement.

## 3. Coverage A, Hull, Machinery, Equipment and Dinghy

If a sum insured is shown for Section A of the insuring agreement declaration page, we provide coverage for accidental physical loss of, or accidental physical damage to the Scheduled Vessel which occurs during the period of this insuring agreement and within the limits set out in the insuring agreement declarations page, subject to the insuring agreement provisions, conditions, warranties, deductibles and exclusions.

Reasonable expenses incurred by you in attempting to minimise or mitigate a loss incurred and covered by this insuring agreement will be paid by us whether successful or not. These will be paid in addition to the sum insured under Sections A and F. Our maximum liability for these expenses is 50% of the sum insured under Section A of this insuring agreement less the deductible shown under Sections A and F.

If a sum insured is shown for "Non Emergency Towing" on the insuring agreement declaration page, this represents the maximum amount per incident or event and for the duration of this policy, that we will pay in respect of expenses incurred by you for such charges, where the Scheduled Vessel is in no immediate danger, but are incurred in good faith to prevent loss or damage to the Scheduled Vessel.

PB000147

We will pay salvage charges incurred by you in pursuance of 'your duties in the event of a loss' as set out in Section 10 of this insuring agreement, up to the limit of the sum insured under Section A of this insuring agreement less the deductible shown under Section A.

If the Scheduled Vessel shall come into collision with any other ship or vessel and you, in consequence thereof, become legally liable to pay by way of damages to any other person or persons any amount not exceeding the agreed value of the Scheduled Vessel hereby insured, we will reimburse you such amount paid, up to the agreed value hereby insured, less the deductible shown under Section A.

In no case shall the foregoing clause extend to cover any amount you become legally liable to pay in respect of removal of obstructions under statutory powers or for injury or damages to Harbours, Wharves, Piers, Stages and similar structures consequent on such collisions, or in respect of the cargo or engagements of the insured vessel or for loss of life or personal injury, or for loss of income, value or otherwise of any other vessel or person.  In no case shall our maximum liability exceed the sum insured hereunder.

The deductible shown under Section A of the insuring agreement declaration page shall apply to each claim under the insuring agreement except for claims for actual and/or constructive and/or compromised total loss of the Scheduled Vessel. In the event of loss or damage arising from a named windstorm the deductible detailed below shall apply.

Loss or damage to the Scheduled Vessel arising from a named or numbered windstorm shall be subject to a deductible which shall apply to all claims, including actual and/or constructive and/or compromised total loss of the insured vessel, equal to double the deductible as shown on the declaration page under Sections A and/or F of the insuring agreement.

## Exclusions to Coverage A

Unless specifically agreed by us in writing and additional premium charged the following losses and/or damages (whether incurred directly or indirectly) are not covered by this insuring agreement:

a) Loss of or damage sustained by the Scheduled Vessel whilst being transported over land (whether by trailer or other method of conveyance approved by us in writing), more than 250 miles from the normal place of storage, as disclosed within your application form.

b) Losses due to wear and tear, gradual deterioration, lack of maintenance, inherent vice, weathering, insects, mould, animal and marine life.

c) Marring, scratching or denting of the hull and/or equipment of the Scheduled Vessel.

d) Osmosis, blistering or electrolysis.

e) The costs of replacing or repairing any item of equipment which has failed as a result of manufacturing defects or design defects, including latent defects.

f) Unrepaired damage claims if the Scheduled Vessel is subsequently deemed by us to be an actual or constructive total loss, during the insuring agreement period.

g) Losses caused directly or indirectly by ice or freezing.

h) Loss or damage caused intentionally by you and/or any member of your family.

i) Theft of the Scheduled Vessel and or its equipment whilst on a trailer unless the Scheduled Vessel is situate in a locked and fenced enclosure or marina and there is visible evidence of forcible entry and or removal made by tools, explosives, electricity or chemicals.

j) Your personal expenses or those of your family including but not limited to, the cost of your own labour, hotel or accommodation costs, car rental and communication costs.

SYP/7/PPO

Page 3 of 13

PB000148

k)      Losses caused by delay in repairs and/or loss of use and/or enjoyment of the Scheduled Vessel and/or its equipment.

l)      Loss and/or damage to sails, sail covers, external canvases, including but not limited to Bimini Tops, arising from a named windstorm unless properly removed and stowed

m)     Any loss of value of the Scheduled Vessel and/or its equipment as a result of repairs and/or replacements being effected as a result of any claim hereunder.

n)      Damage existing prior to the inception date of this insuring agreement, whether you are aware of the same or otherwise.

o)      Loss or damage to the Scheduled Vessel and/or its equipment where you have abandoned the Scheduled Vessel without damage which would have resulted in a payable claim hereunder.

p)      Loss of, or damage to the Scheduled Vessel as a result of any repair yard lien being enforced, including but not restricted to the arrest or detention of the Scheduled Vessel by any repair yard.

q)      The loss of or replacement of fuel or perishable goods that are on board the Scheduled Vessel at the time of loss.

r)      Damage to the Scheduled Vessel's engines, mechanical and electrical parts, unless caused by an accidental external event such as collision, impact with a fixed or floating object, grounding, stranding, ingestion of foreign object, lightning strike or fire.

## 4. Coverage B.  Third Party Liability

If a sum insured is shown under Section B of the insuring agreement declaration page, we provide coverage for any sum or sums which you or any other covered person become legally liable to pay and shall pay as a result of ownership or operation of the Scheduled Vessel.

We will settle or defend as we deem appropriate any claims or suits brought against you, using attorneys of our choice where we deem necessary.  Our obligation to settle or defend all third party liability claims under this insuring agreement ends when the amount we pay for damages, investigation costs, legal expenses and removal of wreck equals the sum insured under this section of the insuring agreement.

The deductibles shown on the insuring agreement declaration page shall apply to each third party liability claim.

## Exclusions to Coverage B

Unless specifically agreed by us in writing and an additional premium paid, Liability cover is not provided for:

a)      Covered persons with regard to their liability to you, other covered persons, your spouse, other members of your family or persons who reside in your household.

b)      Your liability to other covered persons, your spouse, other members of your family or persons who reside in your household.

c)      Liability assumed by you under any contract or agreement.

d)      Liability which arises while the Scheduled Vessel is being transported on its own trailer or otherwise, except where the vessel is being hauled out or launched by a covered person.

e)      Fines or penalties imposed by any Government agency.

f)      Punitive or exemplary damages, however described.

PB000149

g)     Liability due to pollution by any substance whether it be gradual, or sudden and accidental except as provided for in the Pollution Coverage Extension of this Insuring Agreement.

h)     Intentional acts.

i)     Bodily injury or death benefits which are required to be or are covered by any State or Federal Act or Statute or any other compensatory statute.

j)     Bodily injury or death benefit to any persons employed by a covered person, hired as crew or not.

k)     Liability to persons being towed, or to be towed, or having been towed in the water or in the air, from the time they commence to leave the Scheduled Vessel, until they are safely back on board, other than that provided under limited extension of liability for waterskiing detailed in Coverage B Water Skiing Coverage Limitation of Liability.

l)     Liability to or for divers operating from the Scheduled Vessel, from the time they commence to leave the Scheduled Vessel, until they are safely back on board.

m)     Liability to fare paying passengers or passengers carried under charter.

n)     Liability for damage to any marine estuary, artificial or natural reef, living or dead coral or other marine organisms, caused by the vessel or its operators or passengers.

o)     Loss or damage to any other vessel caused by the operation of the Scheduled Vessel in so far as the same would have been covered under Section A of this insuring agreement.

p)     Liabilities, medical expenses, costs, fees or any other related expense whatsoever arising out of illness or injury in any way related to or caused by exposure to the sun or the sun's rays either cumulatively or suddenly.

q)     Any claim arising from directly or indirectly caused by or associated with Human T-Cell Lymphotropic Virus type III (HILV II) or Lymphadenopathy Associated Virus (LAV) or the mutants derivatives or variations thereof or in any way related to Acquired Immune Deficiency Syndrome or any syndrome or condition of a similar kind howsoever it may be named.

## Coverage B, Water Skiing Coverage Limitation of Liability

Whilst the Insured vessel is being used for water skiing, the third party liability limits relating to this activity are reduced to:

| | |
|---|---|
| Property damage | US $10,000 |
| Bodily Injury | US $10,000 |
| Maximum any one incident | US $20,000 |

These limits shall apply from the time any person or persons begin to leave the Scheduled Vessel, or such activity commences, and will continue until the person or persons are safely back on board and such activity ceases completely. All other terms, warranties, conditions, exclusions, remain unaltered and in effect save for exclusion k) above.

Any amount recoverable hereunder shall form part of the maximum amount recoverable under Section B Liability and within the Combined Single Limit.

## Coverage B, Extension to include Crew Liability

Subject to our prior written agreement and your payment of an additional premium, we may at your request extend this insuring agreement to cover any sum or sums you become legally liable to pay and shall pay to hired crew resulting from injury, illness or death occurring whilst in the service of the Scheduled Vessel.

PB000150

The maximum amount recoverable in respect of crew liability claims shall be the amount shown on the insuring agreement declaration page and shall form part of the maximum recoverable under Section B, Third Party Liability and within the Combined Single Limit. All other terms, warranties, conditions, exclusions remain unaltered and in effect save for exclusion i) and j) above.

The deductible shown on the insuring agreement declaration page shall apply to each crew liability claim.

## Coverage B, Extension to include Limited Pollution Coverage

It is hereby noted and agreed that in consideration of the additional premiums charged herein and notwithstanding exclusion (g) Coverage B Third Party Liability, we agree to indemnify you for reasonable costs incurred by you preventing or mitigating a pollution hazard or threat thereof resulting directly from damage to the scheduled vessel, where coverage is afforded under this insuring agreement, provided always that such pollution hazard or threat thereof:

a)      Was sudden, unintentional and unexpected by you.

b)      That the incident commenced during the period of this insuring agreement.

c)      It became known to you within 72 hours of its commencement.

d)      Was reported to us in writing not later than seven days after having become known to you.

e)      Was not a result of your want of due diligence or that or your managers, servants or agents to prevent or mitigate such pollution hazard to threat thereof.

These reasonable expenses must be incurred within one year from the commencement of the incident giving rise to a claim hereunder. Any amount recoverable hereunder shall form part of the maximum amount recoverable under Section B Liability and within the Combined Single Limit.

## 5. Coverage C, Medical Payments

If a sum insured is shown under Section C of the insuring agreement declaration page, we will pay reasonable medical and/or funeral expenses necessary due to accidental bodily injury or death of third parties, incurred whilst boarding, leaving or onboard the Scheduled Vessel insured under this insuring agreement. These expenses must be incurred within one year from the date of the accident and will reduce any amount payable under Section B of this insuring agreement, arising from the same occurrence.

This coverage will be in excess over any other applicable insurance.

Any sum insured under this section is our maximum liability for all claims arising from any one event, regardless of the number of persons involved. Any payment made by us under this section is not an admission of liability for you or by us.

The deductible shown on the insuring agreement declarations page shall apply to each claim made under this section of the insuring agreement.

## Exclusions to Coverage C

We do not provide medical payment coverage for:

a)      Covered persons, their spouses, family or other persons who reside with them. Employees of covered persons or anyone that is or should be covered under a State or Federal Act or Statute.

b)      Responsibility assumed under any contract or agreement.

c)      Anyone injured whilst the Scheduled Vessel is being transported, hauled out or launched.

PB000151

d)   Trespassers on the Scheduled Vessel.

e)   Anyone to or for whom benefits are payable under any State or Federal Workers
Compensation Act including but not limited to State Workers Compensation Act, Federal
Longshoreman's and Harbour Workers Compensation Act or Federal Jones Act.

## 6. Coverage D, Uninsured Boaters

If a sum insured is shown under Section D of the insuring agreement declaration page, coverage is
provided in respect of sums which covered persons under this insuring agreement are legally entitled to
recover from a third party vessel owner or operator, but which cannot be recovered either because they
have no marine liability insurance and no realisable assets or they cannot be identified, such as a hit
and run operator.

The deductible shown on the insuring agreement declaration page shall apply to each claim made under
this section of the insuring agreement.

The sum insured in respect of this coverage is our maximum liability for all uninsured boater claims
regardless of the number of people involved and the number of claims made.

## Exclusions to Coverage D

We do not provide coverage for:

a)   Claims settled without our prior written consent.

b)   Loss due to an uninsured vessel which is a Government vessel.

c)   Loss due to a vessel owned and/or operated by a covered person.

d)   Loss where no physical damage to the Scheduled Vessel exists, evidencing collision.

e)   Any loss or damage otherwise recoverable under this insuring agreement.

f)   Bodily Injury, illness or death of any covered person.

g)   Any loss otherwise excluded by any provision of this Insuring Agreement.

## 7. Coverage E, Trailer

If a sum insured is shown under Section E of the insuring agreement declaration page, we provide
coverage for accidental physical loss of or physical damage to the trailer if it is used exclusively for the
transportation of the Scheduled Vessel insured under this insuring agreement, up to the sum insured.

Claims will be paid up to the limit of the sum insured, on the basis of the actual cost of repairing or
replacing the trailer with a trailer of like kind and value. Depreciation due to age and wear and tear
will be taken into account in calculating claims under this insuring agreement.

Reasonable expenses incurred by you in attempting to avert or minimise a loss covered by this insuring
agreement will be paid by us, whether successful or not. These will be paid in addition to the sum
insured under Section E without application of the insuring agreement deductible. Our maximum
liability for such expenses is the sum insured under Section E.

The deductible shown on the insuring agreement declaration page shall apply to each claim under the
insuring agreement except for claims for actual or constructive total loss of trailer and claims for
expenses incurred in attempting to avoid or minimise a loss covered by the insuring agreement.

A deductible of 10% of the agreed value of the Scheduled Vessel trailer shall apply to each theft loss,
including total loss of the trailer. However a deductible of 5% of the agreed value of the trailer shall

PB000152

apply to each theft loss, including total loss, provided the scheduled trailer is stored in a commercial storage yard or marina that provides 24 hour security.

## Exclusions to Coverage E

a)   Damages sustained by the trailer whilst the Scheduled Vessel is being transported over land, more than 250 miles from the normal place of storage, unless specifically agreed by us in writing and an additional premium paid.

b)   Losses due to wear and tear, gradual deterioration, lack of maintenance, weathering, insects, mould animal or marine life.

c)   Marring, scratching or denting.

d)   Manufacturing defects or design defects, including latent defects.

e)   Tyre damage.

f)   Losses due to exceeding manufacturer's maximum load or speed specifications.

g)   Your personal expenses or those of your family including but not limited to, cost of your own labour, hotel or accommodation costs, car rental, communication costs.

h)   Theft of the trailer unless the trailer is stolen from a locked and fenced enclosure or marina and there is visible evidence of forcible entry or removal made with tools, explosives, electricity or chemicals.

## 8. Coverage F, Personal Property

If a sum insured is shown under Section F of the insuring agreement declaration page, we will cover direct loss or damage to personal property from any accidental cause, whilst property is onboard, being loaded onto, or unloaded from the Scheduled Vessel. Our maximum liability in respect of all claims arising from one event is the amount of the sum insured and our maximum liability for any one item, pair or set is US$1,000.

Fishing gear and tackle, unless permanently affixed to the Scheduled Vessel, is deemed personal property.

Claims will be settled on the basis of actual cash value of personal property, less the insuring agreement deductible and any claim made hereunder shall be adjusted in accordance with general principles of average. Where the sum insured is less than the overall actual cash value of the covered property situate on the Scheduled Vessel, we will only pay claims in the ratio that such sum insured bears to the overall cash value of the covered property situate on the Scheduled Vessel at the time of the covered loss.

## Exclusions to Coverage F

We will not cover loss or damage to or in respect of

a)   Money, jewellery, watches, travellers cheques or any form of paper of value, furs, china, glass, silverware, antiques, collectibles or computer software.

b)   Fishing gear or tackle which is permanently affixed to the Scheduled Vessel, unless the Scheduled Vessel insured hereunder shall become an actual or constructive total loss, due to a covered loss.

c)   Food and or perishable items, including any type of fuel
We will not cover losses due to:

PB000153

a)   Wear and tear, gradual deterioration, inherent vice, corrosion, damage due to changes in
     humidity or temperature or mechanical or electrical failure.

b)   Breakage of articles of a brittle nature unless caused by the Scheduled Vessel being stranded,
     sunk, burnt, on fire, or in collision or by stress of weather, burglars or thieves.

c)   Loss of water-skis or diving equipment, unless as a result of fire, or theft following forcible
     entry, or a total loss of the Scheduled Vessel.

d)   Theft and or damage caused by theft unless there is visible evidence of forcible entry and
     removal made by tools, explosives, electricity or chemicals.

## 9. General Conditions & Warranties

a)   It is warranted that the Scheduled Vessel shall be used solely for private and pleasure
     purposes, and will not be used for Charter, hire lease or any other commercial activity.

b)   It is warranted that the Scheduled Vessel is seaworthy at all times during the duration of this
     insuring agreement. Breach of this warranty will void this insuring agreement from its
     inception.

c)   This insuring agreement incorporates in full your application for insurance and, together with
     any endorsements issued herein constitutes the entire contract between us. At your request,
     various provisions of this insuring agreement may be varied by us but only by our prior
     written agreement.

d)   This insuring agreement does not cover any loss or damage which occurs after its expiration.
     However, if you have been at sea in the Scheduled Vessel for at least 24 hours and this
     insuring agreement expires other than due to cancellation, you may renew or reinstate the
     insuring agreement at such time as the Scheduled Vessel arrives safely at its next port of call
     and for a further 24 hours provided that you contact us during that 24 hours and make the
     necessary arrangements as may be required by us to renew or reinstate the insuring agreement.

e)   This insuring agreement may be cancelled by either you or us at any time, subject to 10 days
     prior written notice. If it is cancelled by us, we will pay you a pro rata return of premium. If
     it is cancelled by you, we shall pay you a short rate return of premium calculated at pro rata
     less 10%. However if a reduced premium has been charged in consideration of a period of lay
     up or an earned premium in respect of an agreed extended voyage, the return premium will be
     calculated based upon the actual activity of the scheduled vessel, and then pro rata or short
     rate applied. Cancellations due to sale of the scheduled vessel or non-payment of premium, or
     non-payment of premium instalment to a premium financier are deemed cancellations by you.
     All policy fees are deemed earned at the inception of the policy.

f)   If you sell or pledge the Scheduled Vessel or otherwise transfer ownership in part or in full, or
     give up possession of the Scheduled Vessel, whether actual or otherwise, this insuring
     agreement is immediately cancelled by your action unless you have our prior written
     agreement to the contrary.

g)   In the event of an actual and/or constructive and/or compromised total loss under this insuring
     agreement the annual premium is deemed fully earned by us.

h)   If you have used a broker to effect coverage, it is hereby agreed that your brokers or any
     substituted brokers (whether surplus line approved or otherwise), shall be deemed to be
     exclusively the agents of you and not of us in any and all matters relating to, connected with or
     affecting this insurance. Any notice given or mailed by or on behalf of us to the said brokers in
     connection with or affecting this insurance, or its cancellation, shall be deemed to have been
     delivered to you.

PB000154

i)   We need not accept or pay for any property abandoned by you.  At our option however we are
     entitled to the salvage value of any property or equipment where we have settled a claim in
     full under this insuring agreement, in respect of such property or equipment.

j)   It is warranted that covered persons must at all times comply with all laws and regulations,
     governing the use and or operation of the Scheduled Vessel.

k)   If the Scheduled Vessel is fitted with fire extinguishing equipment, then it is warranted that
     such equipment is properly installed and is maintained in good working order.  This includes
     the weighing of tanks once a year, certification/tagging and recharging as necessary.

l)   If you give up your rights or our rights to recover damages from anyone who may be liable to
     you, denying us the benefit of the right of recovery, payment of any admissible loss under this
     insuring agreement shall be reduced by the amount we have been denied.

m)   This contract is null and void in the event of non-disclosure or misrepresentation of a fact or
     circumstances material to our acceptance or continuance of this insurance. No action or
     inaction by us shall be deemed a waiver of this provision.

n)   We will not pay for any loss resulting from i) radioactive contamination, or nuclear reaction ii)
     pollution or contamination by any substance (other than to the extent provided for under
     extension of Section B Limited Pollution Coverage) iii) war declared or not, civil war,
     insurrection, rebellion, revolution or the consequences of any of these iv) capture, seizure,
     arrest, restraint or detainment by any government power or authority, lawful or otherwise.

o)   If we take steps to protect damaged or endangered property, this does not constitute
     acceptance of abandonment of that property by us or acceptance of any claim as may be
     covered hereunder.

p)   If any covered person has other insurance against risks covered by this insuring agreement,
     then this insurance shall be in excess over all other valid and collectible insurances.

q)   Unless we specifically agree in writing, and the appropriate endorsement is issued, this
     insurance does not cover loss or liability incurred during a race or speed trial or during
     preparation for a race or speed trial.

r)   Unless we agree in writing to the contrary, if we request a survey of the Scheduled Vessel then
     it is warranted that such survey is in existence prior to the effective date of this insurance and a
     copy of the same must be received by us within 30 days of the effective date of this
     agreement.  If the survey makes any recommendations with respect to the Scheduled Vessel,
     then it is warranted that all such recommendations are completed prior to any loss giving rise
     to any claim hereunder, by skilled workmen using fit and proper materials and that either.

     1) The surveyor who carried out the survey certifies in writing that all recommendations have
     been completed to his (the surveyors) satisfaction prior to any loss and/or claim

     Or,

     2) The workmen/repair yard that carried out the said work and/or recommendations certifies in
     writing that all recommendations have been completed prior to any loss and/or claim.
     Failure to comply with this warranty will void this agreement from inception.

s)   No suit or action on this Insuring agreement for the recovery of any claim shall be sustainable
     in any court of law or equity unless the Assured shall have fully complied with all the
     requirements of this Insuring agreement, nor unless commenced within one (1) year from the
     date of the happening or the occurrence out of which the claim arose, provided that where such
     limitation of time is prohibited by the laws of the state wherein this insuring agreement is
     issued, then, and in that event, no suit or action under this Insuring agreement shall be
     sustainable unless commenced within the shortest limitations permitted under the laws of such
     State.

SYP/7/PPO                                                              Page 10 of 13

PB000155

t)   Where any term herein is referred to as a 'warranty' or where any reference is made herein to the word 'warranted', the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception.

u)   Where a lay up 'laid up period' has been specified within the declaration page, it is warranted that the Scheduled Vessel will not be used, navigated or utilised, in any manner whatsoever, during the dates so specified.   'Use' includes, but is not restricted to, living on board the Scheduled Vessel.

v)   The Scheduled Vessel shall be valued at the agreed valuation shown on the declaration page or on any endorsement thereto issued by us. However the following items are subject to payment on the basis of depreciated cash value less the applicable deductible .Depreciated cash value means replacement cost less the annual percentage factor of depreciation shown as follows;

   i)     Internal and/or external paints, finishes, gelcoat or other covering - 10% per annum.
   ii)    Bottom paint including but not limited to anti-foul or barrier coat finishes- 50% per annum.
   iii)   Sails, standing and running rigging - 12.5% per annum.
   iv)    Internal and/or external protective covers, canvas, vinyl and other materials and their frames – 20% per annum.
   v)     Internal and/or external upholstery, fabrics, wall coverings, carpets and rugs - 10% per annum.
   vi)    Machinery including but not limited to engines, generators, water makers and waste systems - 7% per annum.
   vii)   Outboard Motors - 20% per annum.
   viii)  Outdrives, propellers, shafts, rudders, struts, couplings, trim tabs, stabilisers - 20% per annum.
   ix)    Batteries and solar charging panels - 20% per annum.
   x)     Electrical equipment including but not limited to internal and external appliances, navigational aids, depth sounders, winches, pump motors and electric deck gear  - 10% per annum.
   xi)    Mast and spars – 5% per annum.
   xii)   Stanchions and lifelines – 10% per annum.
   xiii)  Inflatable tenders, dinghies or life rafts – 12.5% per annum.
   xiv)   Harp FRP, composites, aluminium or wood tenders, dinghies or life rafts – 10% per annum.

The cost of dry docking and/or lay-days shall be adjusted in accordance with the required time to complete the repair of covered losses.

However in no event shall the depreciated value be less than 20% of the replacement cost. Reasonable labour costs to repair or replace the damaged items following a recoverable claim shall be payable in full subject always to the applicable deductible.

If the hull is made in whole or in part of plywood, fibreglass, metal or other material of similar nature its repair shall be made by applying suitable patches to the damaged hull area in accordance with generally accepted good repair practice. This insuring agreement does not cover the cost or expense of painting or impregnating colour beyond the immediate damaged area or areas.

w)   We have the right to either pay you the reasonable costs of repairs of your vessel or we will declare your vessel a constructive total loss.  Where we have paid the agreed value of your vessel to you as a result of our declaring the Scheduled Vessel a constructive total loss, you will, at our request, transfer title to the Scheduled Vessel either to us or to our designated or named nominee. We will provide you with the option to retain title to the Scheduled Vessel should you match or better the highest bid to purchase the vessel that we receive.  We may offset any claim payment due to you against such sum due should you retain title to the Scheduled Vessel in accordance with the above.

PB000156

x)      It is warranted that the Scheduled Vessel will be operated only by covered persons. However, in the event of an incident occurring when the vessel is being operated by any person other than a covered person that may give rise to a claim under this insurance, you have a period of seven days following such an incident to submit details of the operator for retroactive approval by underwriters, such approval not to be unreasonably withheld.

y)      Where you are entitled to limit your liability to third parties the maximum recoverable under Section 4 Coverage B, third party liability herein, is the amount you become legally liable to pay or the limit of coverage shown under Section B of the insuring agreement declaration page, whichever is the lesser amount.

z)      Where two or more insurers subscribe to this insurance their obligations are several and not joint and are limited solely to the extent of their individual subscriptions. The insurers in such circumstances are not responsible for the subscription of any co subscribing insurer who for any reason does not satisfy all or part of its obligations hereunder.

## 10. Your Duties In The Event Of A Loss

1)      Immediately take all possible steps to minimise the loss and protect the Scheduled Vessel from further loss.  Failure to do so may invalidate your insurance coverage or reduce the amount of any claim hereunder.

2)      Within 30 days of a loss giving rise to any claim hereunder give us written notification of the loss and its circumstances, this term is a condition precedent to our liability hereunder.

3)      Comply with any reasonable request made of you, by us with regard to the loss.

4)      Advise the Police, Coast Guard, or any appropriate authority of the loss and its circumstances.

5)      Give us an opportunity to examine the damaged property before it is repaired or discarded.

6)      Submit a claim form and/or statement describing the loss, together with two estimates of repair cost and/or records to substantiate the amount of the loss.

7)      Neither assume obligation, nor admit liability without our written permission to do so.

8)      Immediately forward to us any legal papers or notices received in connection with the loss.

9)      Cooperate with us in the investigation, defence or settlement of any loss and agree to be examined under oath if we so request.

10)     Allow examination by physicians of our choice.

11)     Assist us in obtaining copies of medical records and reports.

12)     Give us a notarised statement or statutory declaration if we so request.

13)     Give us a proof of loss and discharge of liability once the amount of the claim under this insuring agreement has been agreed with you.

14)     Preserve any right of recovery from others. When we pay a loss, your right to recover becomes ours up to the amount of our payment together with any legal fees and expenses. You must also co-operate with us to recover the losses we may pay. Any amounts recovered from others belong to us up to the amount of our payment together with any legal fees and expenses.

PB000157

## 11. Service of Suit, Choice of Law And Forum

It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York.

It is also hereby agreed that any dispute arising hereunder shall be subject to the exclusive jurisdiction of the Federal courts of the United States of America , in particular,  the Federal District court within which you the Assured resides or the Federal District court within which your insurance agent resides.

It is further agreed that:

a)      the Assured may serve process upon any senior partner in the firm of:

Mendes & Mount, LLP
750 7th Avenue
New York, NY 10019

and that in any suit instituted against any one of them upon this contract the Underwriters will abide by the final decision of the Court or any Appellate Court in the event of an appeal.

b)      The above named are authorised and directed to accept service of process on behalf of Underwriters in all such suits and/or upon request of the Assured to give written undertaking to the Assured that they will enter a general appearance upon the Underwriter's behalf in the event such a suit shall be instituted.

c)      Further, pursuant to any Statute of any State, Territory or District of the United States of America which makes provision therefore, Underwriters hereby designate the Superintendent, Commissioner or Directors of Insurance or any other officer specified for that purpose in the statute, or his successor or successors in office (The Officer) as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above named as the person to whom the Officer is authorised to mail such process or true copy thereof.

This wording is the property of Osprey Special Risks Ltd and may not be reproduced wholly or in part by any means whatsoever without the express written permission of Osprey Special Risks Ltd.  Osprey Special Risks Ltd will seek legal redress from any person or persons found to have infringed their copyright.

PB000158

# Osprey Special Risks Ltd.

# Treating Customers Fairly

# Policy Statement

We are committed to treating customers fairly as a matter of good business and fair dealing. To achieve this, we give the following undertakings:

- We will take all reasonable steps to only do business with brokers and professional intermediaries who are licensed by their local governmental authority to arrange insurance.
- We will ensure that all intermediaries that we do business with are provided with clear and full descriptions of the coverage we offer.
- Our policy documentation will be in accordance with market & regulatory standards.
- We will ensure that all claims are handled promptly and in accordance with the terms of the policy.
- We will only employ competent staff and will ensure that they are properly trained to carry out their jobs.

If for any reason, you feel that we have failed to meet the high standards that we have set ourselves, we would like to know and would encourage you to follow the complaints procedure set out below.

- Firstly, raise the issue either orally or in writing with the person at your broker's office dealing with your insurance.
- Within 5 business days of receipt by your broker he should have sent you a written acknowledgement advising you of the person who will be dealing with your concerns.
- Within 20 business days we will provide you or your advisers with a written response unless the matter is sufficiently complicated to require further investigation, in which case we will advise you or your advisers of this in writing, with an explanation of why we cannot yet make a determination. We will also advise you of when you may expect our final response.
- None of the above procedure in any way affects your right to legal advice or assistance or to seek assistance from your local insurance regulator.

## FAQ

### Who are Osprey Special Risks Limited?
This company is incorporated and operates under the laws of the United Kingdom. We are based in Ilkley, West Yorkshire, within the United Kingdom and act as Underwriting Agents for the Insurers. We were formerly T L Dallas (Special Risks) Ltd. but changed our name in May 2008 to Osprey Special Risks Ltd. All of our personnel and contact details remain the same as before and the company enjoys the same excellent reputation throughout this insurance market. Full details can be obtained by clicking on our web site or searching the records at Companies House www.companieshouse.gov.uk Cardiff, United Kingdom.

### When my vessel is repaired will I receive all the repair costs less my deductible?
We will place your vessel in the same condition it was in before your loss, in so far as it is possible. What this means is that we will apply depreciation to costs that have been agreed as fair and reasonable. The way and manner we apply depreciation is set out within the insuring agreement. Our standard policy is not new for old and this is the reason that we apply depreciation. If however you qualified for our premier yacht policy and paid the appropriate additional premium, depreciation will not be applied.

### What is 'Sue & Labor'?
'Sue & Labor' is most easily defined as an expense that you incur to minimize or minimize loss or damage to your vessel that would be covered by your insurance policy. Your policy obliges you to take all necessary steps to prevent or minimize such loss or damage and even if these are unsuccessful, your insurance will pay the costs you incur over and above any claim that may be paid for loss or damage to your vessel, up to 50% of the agreed value of your vessel.

### What is my deductible?
This is shown on your policy declaration page, alongside each heading of coverage afforded. This is the amount of each claim that you must meet. Usually this is taken off the agreed gross amount of your claim and a net figure arrived at. If your vessel is damaged by a named windstorm then the amount of this deductible will be doubled. Different deductibles also apply to theft losses.

### What is the difference then between 'Salvage charges' and 'Sue & Labor'?
Salvage charges are defined by the insuring agreement as those reasonable charges and expenses that you incur "with our permission and consent" to prevent further loss and or damage to your vessel. We will pay these charges in full without application of your deductible and regardless of whether your normal claim exceeds the deductible.

---

Be wary of accepting terms from salvors that are simply presented to you in the form of their written form of salvage agreement. Do not sign this agreement unless you are certain that you understand what it means and that the charges being made are fair and reasonable. If the salvor refuses to assist you unless you sign then make sure you record the agreement as having being "executed under protest".

### Can any one else apart from me operate my vessel?
Only if we have agreed to this. This is a named operator only policy in order to cover your insurance we require full details of their boating experience, loss record and details of any violation/suspension including auto within the last five years.

### What is a lay up period?
This is the period of time within which it has been agreed that a vessel will not be operated in any manner whatsoever. We will either agree to a lay up of your vessel afloat or on hard. In exchange for this, you may receive a reduced premium. In the event that you do operate your vessel during this period you will not be covered for any losses or damage.

### Am I covered for losses I sustain as a result of not being able to use the vessel during the repair process?
No. This type of loss is specifically excluded.

### What if I sell my vessel during the policy period?
This automatically cancels your policy immediately unless you have our agreement to the contrary. Your vessel will pass. You will receive an appropriate short rate return of premium. You cannot transfer your insurance with title to your vessel.

### What must I do during the duration of the policy period?
You must properly maintain your vessel at all times throughout the term of your policy and ensure that it is seaworthy. This is very important because if it is subsequently determined that your vessel has not been maintained in a seaworthy state, then your entire policy may be prejudiced and not just the particular claim. A marine surveyor can help you with this and advise you whether your vessel is seaworthy. Make sure your surveyor is a member of an organisation such as the society of marine surveyors "SAMS" or some other body that is recognised and has membership details. You must also comply with any regulations covering the use of your vessel for example any coastguard regulations. You must obey any law relating to the use and ownership of your vessel. You must not use your vessel for any illegal or unlawful activity and you must not allow others to do so either. You must not operate your vessel whilst under the influence of alcohol or drugs.

Is my engine covered and other mechanical & electrical items? You have to show that the damage was sustained as a result of some accident and or fortuity that befell you as a result of the operation and or management of your vessel. Engine especially don't last forever and sooner or later will require attention. This is part of general maintenance. Your policy will not cover you for normal wear and tear.

---

### What happens if I take my vessel outside of the navigational limits?
You have already agreed that you will only operate your vessel within a strict area. If you break that agreement we will not pay for any losses that you sustain. Ensure that you properly understand where you can operate and where you may not operate your vessel.

### Can I charge guests for taking them on a trip?
Only if you tell us about this and we have agreed to writing with you.

## TREATING CUSTOMERS FAIRLY

### POLICY STATEMENT

We are committed to treating customers fairly as a matter of good business and fair dealing. To achieve this, we give the following undertaking:

- We will take all reasonable steps to only do business with brokers and professional intermediaries who are licensed by their local governmental authority to arrange insurance.
- We will ensure that all intermediaries that we do business with are provided with clear and full descriptions of the coverage we offer.
- Our policy documentation will be in accordance with market & regulatory standards.
- We will ensure that all claims are handled promptly and in accordance with the terms of the policy.
- We will only employ competent staff and will ensure that they are properly trained to carry out their jobs.

If for any reason you feel that we have failed to meet the high standards that we have set ourselves, we would like to know and would encourage you to follow the complaints procedure set out below.

- Firstly, raise the issue either orally or in writing with the person at your broker's office dealing with your insurance.
- Within 3 business days of receipt by your broker he should have sent you a written acknowledgment advising you of the person who will be dealing with your concerns.
- Within 20 business days we will provide you or your advisers with a written response unless the matter is sufficiently complicated to require further investigation, in which case we will advise you or your advisers of this in writing, with an explanation of why we cannot yet make a determination. We will also advise you of when you may request our final response.
- None of the above procedure in any way affects your right to legal advice or assistance or to seek assistance from your local insurance regulator.





CLAIMS GUIDANCE

PROVIDING A CALMER OUTLOOK FOR MARITIME INSURANCE

**Addresses**
Units 5-6 Dalesway House,
South Hawksworth Street,
Ilkley, West Yorkshire,
United Kingdom, LS29 9LA

Telephone: +44 1943 851 000     Fax: +44 1943 601 854

US Fax Numbers
(305) 513 5788     (954) 252 2233     (218) 720 7985

We know that it's not always "plain sailing" and when you want our help it's important for you to understand that we are here for that purpose and will do whatever we can to ensure that your claim is handled quickly and fairly so that you can get back out on the water enjoying your vessel.

Please take a few moments to read through this leaflet where we hope to have set out a number of points that should assist you if or when you submit a claim.



If you are ever in doubt please do not hesitate to contact us, we would be happy to assist.

*Dry Tortugas National Park, Florida*

## WHO WE ARE

w Special Risks Limited is a marine underwriting agency acting in the provision of hull & machinery with protection and amenity coverage.

It is authorised by the United Kingdom Financial Services Authority under # 312098. www.fsa.gov.uk

In the event of a Loss giving rise to damage to your vessel, time is of the essence, please immediately advise our Claims Department either by fax or by e-mail to: claims@special-risks.co.uk in the first instance.

In addition please feel free to copy any or all of the following individuals:

mark.thomas@special-risks.co.uk
theresa.sugden@special-risks.co.uk
olivia.jones@special-risks.co.uk
sarah.jones@special-risks.co.uk

Full contact details can be found on the front of this document. Under the policy you must report the incident within 30 days.

The following is intended for general guidance only in the event of a claim and is not intended as an exhaustive, final definition of coverage. Whether coverage is in force or not depends on the individual circumstances and facts surrounding each claim.

## THE POLICY

The policy of marine insurance that has been issued to you is known as an "all risks" form of marine insurance policy. This covers you for any loss and or damage to your vessel that is accidental, fortuitous in nature and is incidental to the use of your vessel.

However, not all types of damage and or losses are covered.

The policy excludes some types of damage and incident and you should take time to study these carefully and understand how each exclusion could affect your coverage.

The policy exclusions are set out within the insuring agreement wording under the heading "exclusions to coverage A, B, C, D, E & F". The insuring agreement wording also contains general conditions and warranties that you should be familiar with, which if breached by you could affect coverage. You can obtain a copy of this form of policy from the Policy Wordings section on our website.

If you believe that you may have a claim under your policy above all else, do not delay in the proper presentation of your claim.

Steps to be taken in the event of a loss:

1.  Notify your agent in writing that you have had an incident that may give rise to a claim under your policy.

2.  Obtain a claim form for completion. Fully complete this form and submit it to your agent. If you are unable to obtain a claims form, explain fully in writing exactly what has happened and send this document.

Section 10 of the insuring agreement sets out what you should do in the event of loss of and or damage to your vessel (see "Your Duties in the event of a loss"). Please follow these steps, as any failure by you to do so could delay the processing of your claim and in some cases prevent a recovery.

All that is expected of you is that you act reasonably to preserve your vessel and its equipment from further damage. Consider what steps you would take if you didn't have insurance.

Once you have told your agent, place a note in your diary and follow this up with your agent if no one has contacted you within 7 days. Do not delay in informing your agent.

We usually appoint an adjuster, who may arrange for the damage to your vessel to be surveyed and who will then send a report to us as to the extent of the damage. The appointment of an adjuster is at our discretion and not every incident will require this. You are at liberty to appoint your own representative, however the costs of such representation may be disallowed.

Because not every incident will require an adjuster, it is important that you do not simply wait for one to call you.

Try to obtain at least two repair estimates for the damage to your vessel and send these to your agent as soon as they are available. If an adjuster has been appointed give them to the adjuster, but please keep copies for your own records.

You do not need our permission to begin repairs to your vessel, all you have to do is allow us a reasonable opportunity to assess the damage to your vessel.

If you delay in telling us about the loss, or carry out repairs to the vessel without giving us the opportunity to look at them first, this may affect your coverage.



"When the needs of the few are borne by the many"

*Vessel being recovered after Hurricane Katrina*

## THE ADJUSTING PROCESS

We appoint the adjuster and liability for their fees rests with us whether or not your claim is covered (except where you make a claim under the liability sections of the insuring agreement when the fees form part of your limit of cover).

The adjuster will examine the damage to your vessel that you tell us occurred as a result of the incident in question. They will produce a written report and send that to us. Because we pay the adjuster, the report remains our property and while we may release it at our discretion, we are not obliged to. The adjuster may sometimes give you guidance and assistance on your claim. You can appoint your own adjuster/surveyor at any time to communicate with our adjuster and for agreement to be reached if at all possible but as we have stated elsewhere, the cost of such representation will not always be allowed.

## THE DECISION

Once an adjuster has reported to us, we are usually in a position to provide a rapid decision on your claim.

Once the repair estimates have been approved by us as fair and reasonable, we will instruct the adjuster to make an offer to you to

settle your claim. If you agree to our offer we will always ask you to sign a release document, which you should do in the presence of an attorney or Notary Public. Carefully read this document because once you have signed it we will only accept a further claim for the same incident in exceptional circumstances.

If you are at all unhappy with the decision or any part of the claims process, please contact us to discuss your queries. If you still feel unhappy, then please write to us at the address provided.

The insurers are under no obligation to repair your vessel and in certain circumstance, to repair your vessel will not be economically viable and we will then declare your vessel a "constructive total loss". When we do this you will be paid in full the agreed value of the vessel as it appears on your policy schedule and or any subsequent endorsement. No deductible will be applied normally except where the loss and or damage was caused by a named windstorm or theft. You will normally be given the option of retaining title to your vessel. Your insurers have the option to take title to your vessel but you must appreciate that they are not under any obligation to do so and responsibility for the vessel remains with you unless you are told anything to the contrary. If your vessel is sold to a third party after it has been declared a constructive total loss you may be required to execute a bill of sale. The adjuster assigned to your case will provide you with all the necessary details.

## PAYMENT OF THE CLAIM

Once you have returned the release document to us, we will usually send you your money within 30 days of receipt. We can pay you by way of cheque/draft or money transfer. If you require a money transfer remember to provide us with:

a) The full name and address of your bank
b) Routing number or ABA number
c) Account number
d) Account title

A money transfer usually takes three to four days in effect. We will do our best to pay you before the expiration of 30 days from the day we receive the release, but please be patient. If you have nominated a loss payee on your application form we can only process payment by way of cheque. This cheque will be made out in your name and or the loss payee.

At this or any stage, please feel free to telephone, fax or e-mail our claims department with any query that you might have. Above all we want you to enjoy many hours of safe, trouble free operation of your vessel, but we know that accidents do happen and that's what we are here for. We will assist and advise so far as we are able to.

## COVERAGE SUMMARY

Intermediary:                                      **Policy No: OSPYP/137386**
Rich Haynie Insurance, Inc
2 Nickerson St # 302
Seattle, WA 98109

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein for the amounts of the proportions set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein.

ASSURED:                    Peoples Bank

ADDITIONAL
ASSURED:                    As attached and as agreed by Underwriters

LOSS PAYEE:                 As attached and as agreed by Underwriters

VESSEL:                     "Maamalni"

COVERAGE:                   US$    269,000   Hull & Machinery
                            US$ 1,000,000   Protection & Indemnity CSL
                            US$     10,000   Medical Payments
                            US$    269,000   Uninsured Boaters

PERIOD:                     Twelve Months At 12:01 a.m., June 25, 2012 Local
                            Standard Time.

CONDITIONS:                 As Per Terms And Conditions Attached.

PREMIUM:                    US$3,297.00 C.R.O. + US$200.00 fully earned fees

PB000162

# EXHIBIT M

Charles Guildner                                    October 7, 2013

---

Page 418

1   weren't talking about the same valuation?  And your
2   answer is it's a mistake, correct?
3        A.  Yes.
4        Q.  I'm just sitting here at a loss.  I'm
5   trying to figure out of all the numbers, of all the
6   gin joints, of all the numbers in the world, why you
7   come up with that number to be wrong with, as opposed
8   to any other number you could have been wrong with.
9   You could have said 215,000 US, you could have said
10  225.
11       A.  I think it's more likely to come up
12  with that number to be wrong with than to simply miss
13  the denomination.
14       Q.  Because you're confusing kiwis and
15  dollars at this point, correct?
16       A.  Or whoever talked with the insurance
17  agent was at the time this was done.
18       Q.  So somebody at the bank was confused
19  about dollars and kiwis?
20       A.  Yes.
21       Q.  But it definitely wasn't you, is that
22  your testimony?  Charlie Guildner was not confused
23  about kiwis and dollar denominations, but somebody at
24  the bank was, that's why we got this policy for too
25  much money?

---

Page 419

1        A.  Yes.
2            MS. CARR:  Objection.
3        Q.  And did you pass on the expense of this
4   policy to Ms. Nettleship in your claims?  Does it
5   come into the other costs?
6        A.  Probably.
7        Q.  Okay.
8        A.  I'm not sure.
9        Q.  In your experience of getting insurance
10  on OREO property, do you think 20 percent less would
11  have reduced the premiums in some amount?
12       A.  Yes.
13       Q.  Okay, and so in your mistake, you're
14  actually asking for too much money from Ms.
15  Nettleship, aren't you, if that's the case?
16       A.  Yes.
17           MS. CARR:  Objection, legal conclusion.
18       Q.  Unless of course you actually thought
19  you were listing it for 269 US, in which case this
20  was the perfect amount to get insurance for, correct?
21       A.  But --
22           MS. CARR:  Objection, mischaracterizes
23  testimony.
24       Q.  I didn't say it was your testimony.  I
25  said this would be the right amount of insurance to

---

Page 420

1   get if you were actually intending to list the boat
2   for 269,000 US, correct?
3        A.  Yes.
4        Q.  Because you didn't want to get extra
5   insurance.  That's just costing the bank money now
6   and allegedly the debtor later, correct?
7        A.  Correct.
8        Q.  That's not your job, is it?
9        A.  No.
10       Q.  You don't want the debtor to pay more
11  than they should, do you?
12       A.  No.
13       Q.  They only have to pay what they owe the
14  bank?
15       A.  Yes.
16       Q.  The bank certainly doesn't want to pay
17  more than it has to because it might never collect,
18  correct?
19       A.  Correct.
20       Q.  Because by the time you got to the July
21  12th insurance, you already had a chargeoff to this
22  account, correct?
23       A.  Correct.
24       Q.  There's already a concern that you
25  might not collect on this matter, correct?

---

Page 421

1        A.  Correct.
2        Q.  Who talked to Osprey about getting
3   insurance, you or someone else?
4        A.  I don't remember.
5        Q.  If I go back --
6        A.  It wouldn't have been Osprey, but Rich
7   Haynie.
8        Q.  Your broker?
9        A.  The broker.
10       Q.  If it wasn't you, who would it have
11  been?
12       A.  Amber or Carrie.
13       Q.  Carrie Roat?
14       A.  Yes.
15       Q.  So if I have emails in here explaining
16  exactly who was talking with them, that's the person
17  who must have miscommunicated to them, correct?
18       A.  Correct.
19       Q.  If it's you, that's you?
20       A.  Correct.
21       Q.  So do you recall providing instructions
22  to Ms. Bird regarding the disposition of the
23  equipment and personal property that was on board the
24  vessel after it was arrested, do you recall those
25  conversations or communications or anything?

---

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661 * 800.657.1110          FAX: 206.622.6236

# EXHIBIT N

**Christine Markowski**

| | |
|---|---|
| **From:** | Charlie Guildner |
| **Sent:** | Tuesday, July 17, 2012 5:52 PM |
| **To:** | Amber Olson |
| **Subject:** | Fwd: Peoples Bank |
| **Attachments:** | PeoplesB.pdf; ATT00001.htm; PeoplesB.doc; ATT00002.htm |

Sent from my iPad

Begin forwarded message:

> **From:** Rich <RHaynie.hayni02@insuremail.net>
> **Date:** July 18, 2012 8:29:02 AM GMT+08:00
> **To:** 'Charlie Guildner' <cguildner@peoplesbank-wa.com>
> **Cc:** "'Robin Fuller,'" <robinf@rhins.com>
> **Subject: FW: Peoples Bank**
> **Reply-To:** <RHaynie.hayni02@insuremail.net>
>
> Hello Charlie,
> Please find attached the policy and summary of coverage for Maamalni,
> 1989 Avatar Sailboat.  I hope the sale is progressing and Peoples will
> be able to close on the sale in the near future.
>
> I hope you had a great adventure to Asia.  It has been many years ago
> that I had a trip to Asia provided by the US Navy.
> Take care,
> Rich
>
>
>
> -----Original Message-----
> From:      rossinusa@aol.com
> Sent:      Tuesday, July 17, 2012, 5:15pm
> To:        RHaynie.hayni02@insuremail.net;
> RFuller.hayni02@insuremail.net
> Cc:
> Subject:   FW: Peoples Bank
>
> Hi Rich
>
>
> This is the corrected Coverage Summary Sheet and signed policy
>
>
> Best regards

1

PB000142

Robert

Thames Insurance Services, Inc
15332 Antioch Street, # 822
Pacific Palisades, CA 90272
tel: 310 384 2482
fax: 310 943 0368
Lic # 0G58166
www.thamesinsuranceservices.com

---

This message is for the designated recipient only and may contain
confidential, proprietary or otherwise private information. If you have
received this message in error, please notify the sender immediately and
delete the original. Any other use or distribution of this information
is prohibited.

PB000143

# EXHIBIT O

Begin forwarded message:

**From:** Charlie Guildner <Charlie.Guildner@peoplesbank-wa.com>
**Subject: RE: Broker for MaaMalni**
**Date:** June 25, 2012 3:49:50 PM PDT
**To:** 'Suzan Nettleship' <maamalni@mac.com>

It is listed with Busfield Marine Brokers Ltd in Auckland.  Though it is under contract as we received and accepted an offer late last week.

-----Original Message-----
**From:** Suzan Nettleship [mailto:maamalni@mac.com]
**Sent:** Monday, June 25, 2012 3:46 PM
**To:** Charlie Guildner
**Subject:** Broker for MaaMalni

Charlie, I have been asked by two people in Auckland and one in USA as to who is handling sale.  The one in US is actively looking for a yacht.
If you can let me know I will pass along.
Michael Bell
s/v Maamalni
maamalni.com


Confidentiality Notice:

# EXHIBIT P

Charles Guildner                                          October 7, 2013

---

Page 42

1  though?
2      A.  Yes.
3      Q.  You see the fourth full paragraph
4  therein that starts with the word, "But if"?
5      A.  Yes.
6      Q.  Go to the end of that.  You see where
7  it addressed providing notice for a certain number of
8  legal days?
9      A.  How far close to the end?
10     Q.  These documents have very long run-on
11 sentences, so it's the whole last part of it.  The
12 last, I don't know, three and a half lines, you see
13 it says, "after first giving a notice of a legal
14 number of days, to be given by publication in some
15 newspaper"?
16     A.  Yes.
17     Q.  You see that?
18     A.  Yes.
19     Q.  That requires notice to be given to the
20 debtor under the mortgage, correct?
21     A.  Yes.
22         MS. CARR:  Objection.
23     Q.  You understand that's what it does, Mr.
24 Guildner?
25     A.  As far as I know, yes.

---

Page 43

1      Q.  And it's supposed to be done in a
2  publication in a newspaper, correct?
3      A.  That's what it says.
4      Q.  Okay.  That wasn't done in this case,
5  was it?
6      A.  No.
7      Q.  Did you understand that this ship's
8  mortgage is a contract between the bank and Bluewater
9  Cruising LLC?
10     A.  I don't know that I understand it as a
11 contract, but as security for the contract.
12     Q.  Security for the note, correct?
13     A.  For the note, yeah, which is the
14 contract.
15     Q.  So you don't think the mortgage between
16 the bank and the borrower, or let's make it simpler,
17 the deed of trust between you and Banner Bank is a
18 contract between you and the bank?
19     A.  I don't know that.
20     Q.  You don't know that?
21     A.  I don't know.
22     Q.  You're the head of special assets,
23 correct?
24     A.  No, I'm the chief credit officer.
25     Q.  Where do special assets fall?

---

Page 44

1      A.  They do report to me.
2      Q.  Right, so you're the head?
3      A.  Yes.
4      Q.  Do they report to anybody else?
5      A.  No.
6      Q.  Who do you report to?
7      A.  President.
8      Q.  That's it?
9      A.  Yeah.
10     Q.  Can you read on the second page, second
11 full paragraph, do you see where it says, "Pursuant
12 to the provisions of the Ship Mortgage Act of 1920"?
13     A.  Yes.
14     Q.  You see in the next one down after the
15 jurat, where it says, "Prior and Subsequent Liens
16 Affidavit," it says, "I, the undersigned, in
17 pursuance of the Ship Mortgage Act of 1920," do you
18 see that?
19     A.  Yes.
20     Q.  Do you know why the bank has the
21 reference to the Ship Mortgage Act in its preferred
22 ship mortgage vessel?
23     A.  I don't know for sure.
24     Q.  Do you think the Ship Mortgage Act of
25 the United States applies to mortgages on ships?

---

Page 45

1      A.  That would be my understanding.
2         MS. CARR:  Objection.
3         (Discussion off the record.)
4         (Exhibit-28 marked.)
5      Q.  This is a commercial guaranty from Ms.
6  Nettleship.  Do you recognize this as the commercial
7  guaranty issued in this matter?
8      A.  Yes.
9      Q.  Turn to the second page of that
10 document, under the miscellaneous provisions, the
11 fourth heading down, do you see the governing law
12 again?
13     A.  Yes.
14     Q.  Would you read that one out loud?
15     A.  "Governing law.  This guaranty will be
16 governed by federal law applicable to lender and, to
17 the extent not preempted by federal law, the laws of
18 the State of Washington without regard to its
19 conflicts of law provisions.  This guaranty has been
20 accepted by lender in the State of Washington."
21     Q.  To your knowledge, what federal law is
22 applicable to the bank?
23         MS. CARR:  Objection.
24         MR. BROWN:  And then is there a basis?
25 What's the basis for that objection, Ms. Carr?

---

12  (Pages 42 to 45)

# EXHIBIT Q

Dyan A. Swift                                                    October 10, 2013

Page 78

1  to the bank?  Yes, I would say more than five.
2      Q.  More than ten?
3      A.  I don't remember.
4      Q.  Okay.  So, some unknown amount, but more than
5  five?
6      A.  Likely, yes.
7      Q.  Why would the bank want a Bill of Sale?
8  Let me be more specific --
9      MS. CARR:  Objection, foundation.
10     Q.  -- why would the bank want a Bill of Sale in the
11 marine foreclosures that you are familiar with?
12     A.  Having a signed --
13     MS. CARR:  Same objection.
14 But go ahead and answer.
15     A.  Having a signed Bill of Sale gives us the
16 necessary authority to liquidate the vessel and recover our
17 principal.
18     Q.  Were you aware that the bank was pursuing a
19 lawsuit in New Zealand over this matter?
20     A.  It would be a likely assumption, but I don't
21 recall specifically myself.
22     Q.  So, you don't remember?
23     A.  I don't remember.
24     Q.  And again, for clarification, you don't know
25 what Ms. Nettleship received in exchange for signing the

Page 79

1  blank Bill of Sale?
2      A.  I do not.
3      Q.  I'm going to hand you what's been previously
4  marked as Exhibit-46.  Do you recognize this document?
5      A.  I do.
6      Q.  What is this document?
7      A.  It's an OREO Transfer Request.
8      Q.  Have you ever seen it before today?
9      A.  More than likely.
10     Q.  But do you recall?
11     A.  I don't specifically recall.
12     Q.  Would you agree there appear to be three
13 signatures or sets of initials at the bottom?
14     A.  Yes.
15     Q.  Can you identify the top signature for me, above
16 Special Assets Signature?
17     A.  That's the signature of Amber Olson.
18     Q.  And beneath that, it says CCO Signature, I think
19 I've seen it enough times that I recognize that as Charlie
20 Guildner's signature or initials; correct?
21     A.  Correct.
22     Q.  Beneath that it says CFO/Controller Signature;
23 whose signature is that?
24     A.  That is Lisa Holleman.
25     Q.  And I'm assuming Lisa Holleman was the

Page 80

1  CFO/controller at the time of this document's at least
2  review by her?
3      A.  She was the CFO.
4      Q.  Okay.  Do you see about one-third the way down
5  the page of Exhibit-46, in bold letters it says "Market
6  Value as of Transfer Date"?
7      A.  Yes.
8      Q.  What is that value that's reflected there?
9      A.  $212,429.30.
10     Q.  Do you know where that value comes from?
11     MS. CARR:  Objection, foundation -- well,
12 actually, I'm going to withdraw the objection.
13     A.  It appears that this transfer request is using
14 the list price as the source of value.
15     Q.  Did you have any involvement in drafting this
16 document?
17     A.  Not that I recall.
18     Q.  And I believe you stated earlier that sometime
19 early in 2012, or at least in the first half of 2012, you
20 took on new duties at Peoples Bank; correct?
21     A.  Correct.
22     Q.  I'm presuming it was sometime obviously before
23 June 15th of 2012; right?
24     A.  Yes, it was a gradual transition, but yes.
25     Q.  Gradual transition.

Page 81

1      Do you recall when you first became aware of
2  what the vessel was being listed for?
3      A.  I do not recall any discussion on listing this
4  boat.
5      Q.  So, up to the present day, you don't recall any
6  conversation with anybody about what the MAAMALNI was
7  listed for after it was arrested and seized?
8      A.  Correct.
9      Q.  So, would it come as a surprise to you to know
10 that the MAAMALNI was listed for, in U.S. currency be
11 $212,429.30, or somewhere along those lines, a conversion
12 to New Zealand currency would be $269,000?
13     A.  You're asking if that's a surprise to me?
14     Q.  Yeah, if this is the first that you've ever
15 heard of a listing price; does that come as a surprise to
16 you?
17     A.  Yes, it's a surprise.
18     Q.  It's a surprise because the valuations we looked
19 at earlier today all indicated that the bank's belief and
20 more specifically your belief of the value of the
21 collateral was that it ranged somewhere between 360,000
22 U.S. and 324,000 U.S.; correct?
23     A.  Leads me to assume that there was information
24 that we were not aware of prior to perhaps seeing the boat
25 in person that would have caused a decline in the value.

21  (Pages 78 to 81)

# EXHIBIT R

1          MR ABELL:  Madam Reporter, would you please

2     hand Mr Rees what's been marked as Exhibit 14?

3          I am handing opposing counsel what's been marked

4     as Exhibit 14.

5     **Email chain commencing from Mr Guildner dated**

6     **June 22, 2012 produced and marked as Exhibit 14**

7     BY MR ABELL:

8  Q.   Mr Rees, do you have Exhibit 14 in front of you?

9  A.   Yes, I do.

11:04 10  Q.   Is this an exhibit that comprises one page with the

11        numbering lower right-hand corner of PB002252?

12  A.   It does.

13  Q.   Is this an email that's addressed from YachtHub

14        Enquiries to Boats on June 25th, 2012?

11:05 15  A.   Yes, it is.

16  Q.   Do you see in the middle of Exhibit 14, it has identifying

17        information for the sender, including name, email,

18        phone, city, state and country?

19  A.   Yes.

11:05 20  Q.   Do you see where it says country for Mr McCourt?

21  A.   Yes, I do, Australia.

22  Q.   For clarification, the country that's listed is Australia, is

23        that correct?

24  A.   That's correct.

11:05 25  Q.   So, your expert report is incorrect, in that you received

1     at least five other inquiries from outside New Zealand; is

2     that correct?

3  A.    Yeah, I have to agree with you, yes.

4  Q.    Mr Rees, I'd like to reinvite your attention back to

11:06  5     Exhibit No.9.  This is your expert report on page 2.  The

6     bottom of the last full paragraph you say that, "*If*

7     *someone from outside New Zealand had wanted to buy*

8     *the boat, it would have added substantially to that*

9     *person's cost.  If bought internationally, shipping fees*

11:06 10     *could have been up to $60,000NZ*", do you see that?

11  A.    I do.

12  Q.    Those shipping fees are necessarily going to depend on

13     where the boat is purchased and shipped, correct?

14  A.    Yep, yes, that's correct.

11:06 15  Q.    In other words, the shipping fee for sending the boat to,

16     say, the UK is going to be substantially more than the

17     shipping fee for sending the boat to Australia?

18  A.    Yes, that's correct.

19  Q.    Roughly, how much would the shipping fees be to send

11:06 20     the boat to, say, Sydney?

21  A.    To Sydney, well a boat like that could sail on her own

22     bottom, so delivery costs would be, if you had a

23     professional skipper do it, $10,000-$15,000.

24  Q.    $10,000-$15,000NZ if the vessel were shipped to -

11:07 25  A.    No, if it were sailed, if she was sailed.

# EXHIBIT S

# Colin Rees

| | |
|---|---|
| **From:** | Colin Rees |
| **Sent:** | Sunday, 17 June 2012 11:22 a.m. |
| **To:** | 'cjstaunton@gmail.com' |
| **Subject:** | FW: Ganley 52 |
| **Attachments:** | Y1489 profile.jpg; DSCF1199.JPG; DSCF1204.JPG; ganley 52 draft.doc |

Hello Craig

You had interest in Ganley 50 we have for sale in New Zealand a few months back. Have you purchased?

If not, we are just in the process of listing a very special Ganley 52 Avatar with an asking price of NZ$269,000

This vessel has been seized by the high court in New Zealand, must be sold and Busfield Marine has been given the agency to handle the sale.

The boat is loaded with gear and looks cruise ready. She is a centre cockpit and very nice.

I have attached a description which is a draft and the full specs should be available early next week. She has everything.!

Please let me know if you are interested as I don't think she will be on the market for very long.

Regards,

Colin Rees

Colin Rees
YACHT BROKER
Mobile: 029.9691221

BUSFIELD
MARINE·BROKERS

*23B Westhaven Drive*
*Auckland*
*New Zealand*
64 9 3021220

1

PB002178

# EXHIBIT T

1   Q.    Would you agree that marketing a piece of property as

2         having been seized by a court would be consistent with

3         advertising it to be used at a fire sale?

4   A.    Um, yes, yes, I can.

11:43 5   Q.    Would you agree that phrases like "the property must be

6         sold" would be consistent with advertising to be used at

7         a fire sale?

8   A.    Yep, it could be, yes.

9   Q.    When you say "must be sold", what you mean is that you

11:43 10         believe it had to be sold within 2-3 months, as

11         represented to you by the bank, correct?

12   A.    That's correct.

13   Q.    You would agree that a fire sale usually represents an

14         unusually good bargain, correct?

11:43 15   A.    Sometimes, when it comes to boats sometimes yes and

16         sometimes no.

17   Q.    But more often than not, a fire sale is indicative of an

18         unusually good bargain; correct?

19   A.    It can be, it can be but sometimes with boats it can also

11:44 20         not be.

21   Q.    Can you think of a situation involving the sale of a boat

22         that is a fire sale that does not involve an unusually good

23         bargain?

24   A.    We've sold a number of boats for the police in

11:44 25         New Zealand that have gone through a tender process.

# EXHIBIT U

Charles Guildner                                                    October 7, 2013

---

Page 150

1  necessarily"?  Does that mean yes partly, no partly?
2  What does that mean?
3       A.  It means there may be multiple reasons
4  why.
5       Q.  I don't want to know why there may be.
6  I want to know the reasons why you didn't.  I don't
7  want to know what all the possible universe is.  I
8  want to know why you decided.  The buck stops with
9  you, right, it's all your decision?
10      A.  Yes.
11      Q.  No one is making decisions on this
12 matter but you at this point, right?  They're all
13 asking you.  I see all the emails.  Amber is talking
14 to you, Dyan Swift is talking to you.  I don't see
15 anything from Mr. LeCocq.  But the buck stops with
16 you, correct?
17      A.  Okay.  Yes.
18      Q.  You're the Truman, the buck stops with
19 you, correct?
20      A.  Yes.
21      Q.  On your desk, that was the CCO's deal,
22 right?
23      A.  Yes.
24      Q.  So I don't want to know all the
25 possible reasons.  I want to know, why did you decide

Page 151

1  not to let them stay on the boat with the personal
2  possessions?
3       A.  We didn't trust them.
4       Q.  Wasn't it to leverage them, to make
5  them have to cooperate with the bank?
6       A.  Potentially, partly.  That's what I'm
7  saying, we didn't trust them and --
8       Q.  Potentially or partly?  Those are two
9  different answers.
10      A.  I'm not sure.  You're asking me to
11 remember back them.
12      Q.  I am asking you to remember back then.
13      A.  There are a number of reasons.
14      Q.  And one of them could have been
15 leverage?
16      A.  One of them could have been leverage,
17 yes.
18      Q.  Is it likely it could have been
19 leverage?
20      A.  Yes.
21      Q.  Okay.  Did you think it was funny that
22 they had been thrown out of their house?
23      A.  No.
24      Q.  You understood they were living on the
25 boat, correct?

Page 152

1       A.  Yes.
2       Q.  You understood they had been living in
3  their house/boat, house/boat meaning their home slash
4  boat, for years at this point, correct?
5       A.  Yes.
6       Q.  So you didn't think it was humorous?
7       A.  No.
8       Q.  Didn't think it was worth a chuckle
9  that you could throw people off their boat in a
10 foreign country and leave them without all their
11 stuff?
12      A.  No.
13      Q.  Okay.
14          (Exhibit-40 marked.)
15      Q.  Handing you what's been marked as
16 Exhibit-40, it's an email from you to Amber Olson and
17 Dyan Swift on April 17, 2012 after the boat had been
18 arrested and you say, "Kick em off the boat or let
19 them stay?  I say they walk the plank."
20          Is that what you said in this email?
21      A.  Yes.
22      Q.  And then Dyan Swift wrote back, "I say
23 walk the plank as well.  Fire under their backside to
24 get their affairs in order and pay us off," correct?
25      A.  Yes.

Page 153

1       Q.  Then at the end Amber Olson says,
2  "Nicely done!  I bet we'll get some prompt action
3  now!"  Correct?
4       A.  Yes.
5       Q.  So does that not indicate from you a
6  certain amount of levity when you say "walk the
7  plank," when it comes to a boat and they're being
8  thrown out of their house?
9       A.  No.
10      Q.  It's not levity at all?
11      A.  No.
12      Q.  What did you mean by that?
13      A.  It's not levity.
14      Q.  Did you want them to actually walk the
15 plank?  Were you going to have a plank put out by the
16 registrar and shove them out into the water, was that
17 your plan?
18      A.  No.
19      Q.  You clearly weren't meaning that, were
20 you?
21      A.  No.
22      Q.  So if it wasn't serious, then it was
23 jovial?
24      A.  I don't think so, no.
25      Q.  So what is it?

39 (Pages 150 to 153)

# EXHIBIT V

**Christine Markowski**

| | |
|---|---|
| **From:** | Amber Olson |
| **Sent:** | Wednesday, July 11, 2012 7:33 AM |
| **To:** | 'Pauline Barratt'; Colin Rees |
| **Cc:** | stan@loosmore.com; Charlie Guildner |
| **Subject:** | RE: Importation of Cruising yacht. Maamalni |

Sounds great!  Thank you for all of your help Pauline.  We'll look forward to seeing the documents soon.

Sincerely,





EXHIBIT 58
WITNESS ___
DATE ___

---

**From:** Pauline Barratt [mailto:Pauline.Barratt@jonesfee.com]
**Sent:** Tuesday, July 10, 2012 7:34 PM
**To:** Amber Olson; Colin Rees
**Cc:** stan@loosmore.com; Charlie Guildner
**Subject:** RE: Importation of Cruising yacht. Maamalni

Amber, the High Court has (finally!) entered judgment by default against the vessel.  I will have the judgment sealed and will send it to you with the bill of sale – unless you need the bill of sale immediately, of course.

As per previous instructions, we did not apply to have judgment entered against Ms Nettleship and will be discontinuing the claim against her.  This does not prevent further proceedings being issued in the future, if that proves necessary.

Kind regards

**Pauline Barratt | Partner | DDI +64 9 373 0055**

---

**From:** Amber Olson [mailto:Amber.Olson@peoplesbank-wa.com]
**Sent:** Wednesday, 11 July 2012 3:19 a.m.
**To:** Pauline Barratt; Colin Rees
**Cc:** stan@loosmore.com; Charlie Guildner
**Subject:** RE: Importation of Cruising yacht. Maamalni

That's great.  I am glad the document is not missing as we had feared!  You may send the original document to me at the following address:

1

PB000199

# EXHIBIT W

Charles Guildner                                    October 7, 2013

---

Page 250

1   Documentation Services, correct?
2       A.  Yes.
3       Q.  Do you know what Kim Marine, do you
4   know what they use for their documents, sitting here?
5       A.  Sitting here, no.
6       Q.  What was the third one?  I forgot.
7       A.  Pacific Maritime.
8       Q.  Do you know what they use, sitting
9   here.
10      A.  No.
11      Q.  So if you didn't intend to release the
12  debtors from any further obligation on the debt by
13  signing this document, what do you think you should
14  have wrote on this document instead what you wrote on
15  here?
16      A.  Release.
17      Q.  And not say anything about being paid,
18  right?
19      A.  Correct.
20      Q.  Just release the security interest,
21  kind of like my example when I said I'm going to
22  release some security interest for somebody else's
23  benefit, but I'm not releasing the debt, correct?
24      A.  Yes.
25      Q.  And you've done that lots of times,

---

Page 251

1   haven't you?
2       A.  Yes.
3       Q.  Yes.
4           So we're already up to the time when
5   the sale has already been completed, yes, or in
6   process at least, right?
7       A.  Yes.
8       Q.  I want to back up a little bit to after
9   you've got ownership from Ms. Nettleship and before
10  we have a buyer on the hook.  Are you with me?
11      A.  Yes.
12      Q.  We know it's May 25 till, when do you
13  remember that the buyer approximately got on the hook
14  on this thing?
15      A.  I don't remember exactly.
16      Q.  I'm going to tell you it was around
17  June 21st.  I may be wrong but I think that's pretty
18  close.  So we're looking at less than a month, all
19  right?
20      A.  Yes.
21      Q.  During that time, you retained
22  Busfield, correct?
23      A.  Yes.
24      Q.  Busfield Marine?
25      A.  Yes.

---

Page 252

1       Q.  To be the broker?
2       A.  Yes.
3       Q.  When was your first contact with anyone
4   at Busfield Marine?  And describe that contact.
5       A.  I don't recall exactly.
6       Q.  Sometime in that frame period I just
7   gave you, correct?
8       A.  Yes.
9       Q.  And tell me about the contact.  What
10  was it, was it a phone call, was it an email, was it
11  a letter?
12      A.  I know that we had contact with them
13  via email and phone.
14      Q.  Okay.  Do you know what was first?
15      A.  No.
16      Q.  Okay.  How did you find Busfield
17  Marine?
18      A.  I was referred by Pauline Barratt.
19      Q.  So the lawyer that you didn't know
20  before this transaction and was a one-off
21  transaction, correct?
22      A.  Yes.
23      Q.  Haven't done any work with her since,
24  have you?
25      A.  No.

---

Page 253

1       Q.  Had you ever had any foreclosures or
2   seizures or any kind of lending disputes in New
3   Zealand before this case?
4       A.  No.
5       Q.  And none since I'm guessing?
6       A.  No.
7       Q.  So you found her on the internet and
8   then you asked her for a reference or a referral to a
9   marine broker?
10      A.  Yes.
11      Q.  Did she provide you just one?
12      A.  I don't recall.
13      Q.  Did you check on them?  I'm referring
14  to Busfield.
15      A.  To Busfield?
16      Q.  Did you check up on them, or did you
17  just go oh, the lawyer recommended them, we'll go
18  with it?
19      A.  I don't recall.
20      Q.  Do you recall, did you contact Auckland
21  Ship Brokers?  Did you contact them?
22      A.  I don't recall.
23      Q.  How about Gulf Group Marine Brokers?
24      A.  No.
25      Q.  How about All Boat Brokerage Broker?

---

64  (Pages 250 to 253)

# EXHIBIT X

Charles Guildner                                      October 7, 2013

| Page 270 |
| --- |

1      A.   I didn't know.
2      Q.   Didn't know.
3      A.   No.
4      Q.   Never thought about it?
5      A.   No.
6      Q.   Did you even think about gee, I'd like
7  to actually get paid in full?  Did you ever think of
8  that?
9      A.   Yes.
10      Q.   But you didn't even try listing it for
11  a price that would get you paid in full?
12      A.   No.
13      Q.   Did you even tell Busfield what the
14  debt was on the boat?
15      A.   I don't recall.
16      Q.   Do you remember having a phone call?
17  Because I tell you what, there was no writing you
18  ever told Busfield what it was.
19      A.   I don't recall.
20      Q.   Would you think it would be important
21  for them to know what you were owed on the boat so
22  they would know what you wanted to clear?
23      A.   No.
24      Q.   No?
25      A.   No.

| Page 271 |
| --- |

1      Q.   Did you and Ms. Bird ever sit down and
2  actually come up with a marketing plan on how this
3  was all going to be done and how long it was going to
4  be marketed to get the best price for it?
5      A.   I recall her sending us a plan.
6      Q.   You do?
7      A.   But I don't recall exactly what it
8  said, no.
9      Q.   Was it a plan that says Colin is going
10  to, we're going to sent this out to a few people we
11  know and we're going to put it on the internet?  Does
12  that sound like the plan?
13      A.   I don't recall.
14      Q.   Well, you recall there was a plan, and
15  I'm just saying, do you recall there was anything
16  more than that?  Because that's all I've seen.
17      A.   No.
18      Q.   Do you think that's a really good
19  marketing plan for a quarter million dollar vessel or
20  more?
21           MS. CARR:  Objection, assumes facts not
22  in evidence.
23      Q.   Did you know if Busfield held itself
24  out as the kind of company that would sit down with
25  its clients and develop a marketing plan so they

| Page 272 |
| --- |

1  could maximize the value of the vessel, did you know
2  they were that kind of company?
3      A.   I'm not sure I understand.
4      Q.   Did you know that Busfield held itself
5  out as a company that would work with its clients to
6  develop a comprehensive marketing plan so you could
7  maximize the value of your boat you're selling, did
8  you know that?
9      A.   I don't know that.
10      Q.   That's because you didn't read the
11  website, did you?  Didn't go to the website and look
12  at all the different things they had about deciding
13  to sell the boat, preparing the boat for sale,
14  determining the fair asking price?  Did you know that
15  they had a whole method for that?
16      A.   I assumed so.
17      Q.   But you don't remember any conversation
18  about that?
19      A.   I don't remember conversations about
20  that.
21      Q.   Did Ms. Bird or Mr. Rees ever say it's
22  important to have an independent third party
23  professional opinion on the value on the market price
24  of your boat before you decide to sell it?  Do you
25  remember them telling you that?

| Page 273 |
| --- |

1      A.   I don't remember.
2      Q.   Doesn't that sound like a good business
3  decision on your part to have something like that?
4  If you're going to sell an asset to pay your debt,
5  would you like to figure out what the heck it's worth
6  before you sell it?
7      A.   I relied on the brokers that were
8  professionals in the marketplace at the time and
9  their advice.
10      Q.   And their advice was to get the boat
11  listed and sold, correct?
12      A.   Yes.
13      Q.   How did they get paid?
14      A.   They get a commission.
15      Q.   So if it doesn't sell, what do they
16  get?
17      A.   Nothing.
18      Q.   And if they sell it right away, do they
19  get money sooner or later?
20      A.   Sooner.
21      Q.   So all indications in their business is
22  to go ahead and try to get the boat sold as soon as
23  possible, correct?
24           MS. CARR:  Objection.
25      A.   Yes.

69  (Pages 270 to 273)

# EXHIBIT Y

Charles Guildner                                          October 7, 2013

---

Page 386

1    cost of sale, those already got taken care of?
2         A.   Correct.
3         Q.   Okay.  Did you put any legal fees into
4    the cost of sale or do you keep those separate?
5         A.   Separate.
6         Q.   That's going to be over here in other
7    fees?
8         A.   Yes.
9         Q.   So let's talk about the three columns
10   over here.  So at least as of 10-25-2012, the bank
11   stated the principal amount was $88,525.69 left on
12   this debt?
13        A.   Yes.
14        Q.   Perfect.  Plus these other numbers,
15   correct?
16        A.   Yes.
17        Q.   So interest of $10,374.64?
18        A.   Yes.
19        Q.   At whatever rate, which we're not sure
20   because we haven't seen the document, connect?
21        A.   Correct.
22        Q.   It was either the initial rate -- there
23   was three rates on this matter, I'll represent, see
24   if this squares with you.  There was the initial rate
25   they had for direct deposit or direct debit, and then

---

Page 387

1    there was a slight increase if you cancelled that,
2    and Ms. Nettleship cancelled that at one point?
3         A.   Yes.
4         Q.   So you jacked up the rate just a little
5    bit, right?
6         A.   Yes.
7         Q.   And then there's going to be a default
8    rate if you decide to trigger it?
9         A.   Yes.
10        Q.   Between you and me sitting here today,
11   we don't know if the default rate was triggered or
12   not?
13        A.   Not for sure.
14        Q.   The practice would be yes?
15        A.   Yes.
16        Q.   This number would account for that?
17        A.   Yes.
18        Q.   Meaning if you did trigger it, it's in
19   there.  If you chose not to, it's not in there?
20        A.   Yes.
21        Q.   Late fees, those late fees you said to
22   me should be only late fees that were incurred prior
23   to the whole amount being declared due and payable,
24   correct?
25        A.   Yes.

---

Page 388

1         Q.   You don't get late fees after that, do
2    you?
3         A.   Correct.
4         Q.   And then other fees, what's that going
5    to be besides, what's going to make up the
6    $38,772.02?
7         A.   Legal.
8         Q.   Whose legal?
9         A.   Ours.
10        Q.   Whose billings, Ms. Barratt's?
11        A.   Yes.
12        Q.   Mr. Loosmore's?
13        A.   Correct.
14        Q.   Anybody else?
15        A.   On that date, I'm not sure if we had --
16   no.
17             MS. CARR:  No.
18        Q.   Ms. Carr was not representing you.  So
19   that would have been your legal fees up to date at
20   that point?
21        A.   Yes.  Court costs in New Zealand, any
22   maintenance or repairs that would or would not have
23   been done.
24        Q.   The moorage and stuff you had at
25   Busfield, would that have been rolled into the sale

---

Page 389

1    cost and therefore taken care of there, or to be put
2    into here?
3         A.   Put into here.
4         Q.   So the only thing that came out of the
5    Busfield sale would have been what, commission and
6    tax?
7         A.   Correct.
8         Q.   The GST that you couldn't get the buyer
9    to pay and the commission you owed Busfield?
10        A.   Correct.
11        Q.   Anything else, if there was any kind of
12   custom duties, stamps or whatever?
13        A.   Not that I can think of.  There may
14   have been something small.
15        Q.   So this would be everything else, court
16   registrar, what was the guy's name, Work Boats, who
17   was the tender for keeping the boat secure and all
18   that?
19        A.   Yes.
20        Q.   Do you remember that guy's name, Mr.
21   Guildner?
22        A.   I don't.
23        Q.   So all of that is in the $38,778.02,
24   correct?
25        A.   Yes.

---

98 (Pages 386 to 389)

Charles Guildner                                                October 7, 2013

Page 390

1        Q.  So altogether as of October 25, 2012,
2   it's 130, almost $139,000, real close?
3        A.  Yes.
4        Q.  How much of the $38,778.02 do you
5   recall was made up of the whole New Zealand action?
6   This is Ms. Barratt's time, costs, proceeding in the
7   lawsuit there, all those things.
8        A.  I'd have go back and look to know that.
9        Q.  But you could do that?
10       A.  Yes.
11       Q.  You have all the bills?
12       A.  Yes.
13       Q.  Those have been produced to your
14  counsel as part of bank file?
15       A.  I don't know.
16       Q.  Where would you keep them?
17       A.  I don't know.
18       Q.  Where would you keep them?  When they
19  came from the lawyers, where do they go?
20       A.  They go to accounting.
21       Q.  And then what happens to them?
22       A.  They get paid and held there.
23       Q.  The bills get held in accounting?
24       A.  Yes.
25       Q.  They don't go back and put them in the

Page 391

1   bank files eventually?
2        A.  Not typically.
3        Q.  Really.  So they must then get entered
4   somewhere, right, so that you can keep track of it
5   for purposes of this?
6        A.  Yes.
7        Q.  Because each loan has to keep track of
8   all the fees they're paying, right?
9        A.  Yes.
10       Q.  So if you want to go after a debtor or
11  somebody, you can know exactly what they owe you?
12       A.  Yes.
13       Q.  So it's either a manual entry into a
14  computer system from the bill, or you keep the bills
15  or both, correct?
16       A.  Yes.
17       Q.  But you don't know if it's both, or
18  you're certain it's manual entry in the computer, but
19  you're not sure the bills are still kept?
20       A.  I believe they are.
21       Q.  But you're not sure they're kept in the
22  bank file?
23       A.  In the credit file, no.
24       Q.  When I say bank files on this loan, how
25  many bank files?  You told me you don't have separate

Page 392

1   special assets file, right?  You just take the whole
2   physical file and it gets moved over to special
3   assets?
4        A.  Right, I understand when you say bank
5   file, you mean the file on this loan?
6        Q.  Right, from cradle to grave, it's not
7   in that file, you don't think?
8        A.  I don't know.
9        Q.  You think it's probably kept up in
10  credit in the accounting department?
11       A.  Yes.
12       Q.  With all the other legal fees in all
13  the other cases you've got going on?
14       A.  Yes.
15       Q.  I guess I want to make sure, so what's
16  the purpose of the chargeoff at the end of this?
17  You're just basically kind of thinking at this point
18  it may not look good for collecting the rest of that;
19  is that a fair statement?
20       A.  Yes.
21       Q.  And you're documenting it.
22       A.  The FDIC would look negatively upon us
23  for maintaining an asset on the books that's in an
24  ongoing legal lawsuit.
25       Q.  So although you're saying --

Page 393

1        A.  Whether we think we can collect or not.
2        Q.  Because you think there's a debt owed
3   still, correct?
4        A.  Yes.
5        Q.  And it's $139,000 approximately?
6        A.  Yes.
7        Q.  So that's an asset, at least
8   technically, correct?
9        A.  Yes.
10       Q.  And then you're saying the FDIC says
11  yeah, when you're in a disputed legal fight, don't
12  count those?
13       A.  Right.
14       Q.  Take care of them?
15       A.  That's correct.
16       Q.  So you charge them off?
17       A.  Yes.
18       Q.  Okay.  And what happens at that point
19  in the bank's books?  The asset file, very small, I
20  understand, goes down 139,000?
21       A.  Yes.
22       Q.  What does the assets of the bank lend
23  itself to supporting?  Over here you have assets.
24  What's that allow you to do over here in a bank?
25       A.  Well, it's actually the other

99 (Pages 390 to 393)

Charles Guildner                                          October 7, 2013

---

Page 394

1    direction. We have liabilities that allow us to lend
2    and create assets.
3         Q.  It's an asset to the bank, correct?
4         A.  Yes.
5         Q.  On the other side, you've done the
6    lending that goes with it, correct?
7         A.  Yeah. The loan is the asset.
8         Q.  Right, on that side. So as long as you
9    have assets, you can do what? Make more loans. It's
10   a vicious cycle at the bank, isn't it?
11        A.  As long as I have liabilities, I can
12   make more loans.
13        Q.  And what are the liabilities?
14        A.  Deposits.
15        Q.  And how are you making deposits on this
16   matter? None. There's no more deposits coming in on
17   this matter, correct?
18        A.  There never were.
19        Q.  Because there's no payments on the note
20   coming in anymore?
21        A.  Sorry, the deposits, the deposits allow
22   us to lend and the deposits are not payment on loans.
23        Q.  No, it's people's savings accounts?
24        A.  Right exactly.
25        Q.  The checking accounts?

---

Page 395

1         A.  Yes.
2         Q.  More like savings accounts, I would
3    guess, because my checking account goes in and out,
4    you don't get a chance to touch it.
5         A.  Right.
6         Q.  What happens to the asset value at this
7    point?
8         A.  The asset value is taken to zero.
9         Q.  As far as the bank's books are
10   concerned?
11        A.  Right.
12        Q.  Okay. Still exists somewhere, though,
13   in the bank system?
14        A.  We have just a tracking on it. It
15   would not be reported on the balance sheet of the
16   bank.
17        Q.  Okay.
18        A.  The offsetting entry is a charge to a
19   reserve.
20        Q.  So again, this would indicate that the
21   bank no longer thinks it's going to collect any more
22   money on this debt, correct?
23        A.  No.
24        Q.  No, that's not correct?
25        A.  No, that's not correct.

---

Page 396

1         Q.  What would it be?
2         A.  It indicates that we are holding the
3    assets on our books at a value of zero.
4         Q.  And that's different how?
5         A.  An asset held at value that's involved
6    in an ongoing legal battle is looked poorly upon by
7    the FDIC regardless if we think it's collectible or
8    not.
9         Q.  I understand that.
10            What would look different, what would
11   you do if you'd made arrangement with Ms. Nettleship
12   that after you sold the boat, that would be the end
13   of this? What would you have done in that case?
14            You got to this point on October 25th,
15   the quarter is still around, it's time to take care
16   of things. And you're like well, this is still
17   what's left on the books, but we've made a deal,
18   we're not going to go after Ms. Nettleship, would you
19   enter a chargeoff request like that?
20        A.  Yes.
21        Q.  Would it look just like this?
22        A.  Yes.
23        Q.  Do you see where I'm going?
24        A.  Yes.
25        Q.  Once again, this is evidence --

---

Page 397

1         A.  Except for the pending lawsuit part
2    down at the bottom.
3         Q.  That you wrote okay on there.
4    "Comments: Final chargeoff due to collateral move to
5    OREO, pending lawsuit," right?
6         A.  Yes.
7         Q.  Because you'd already filed your
8    lawsuit?
9         A.  Yes.
10        Q.  Right.
11            You understand the point in Ms.
12   Nettleship, her defense is you shouldn't have done
13   that, you're breaking your agreement to her, do you
14   understand that?
15        A.  No.
16        Q.  You understand she thought the deal was
17   you take the boat, we're all done. So you starting a
18   lawsuit actually looks like you're being in bad
19   faith. Do you understand that?
20            MS. CARR: Objection.
21        A.  Okay.
22        Q.  So the fact that you write pending --
23        A.  You're asking me to understand her
24   position?
25        Q.  Right.

---

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com        206.622.6661 * 800.657.1110        FAX: 206.622.6236

# EXHIBIT Z

Charles Guildner                                          October 7, 2013

---

Page 218

```
 1        Q.  If you already had this bill of sale on
 2   record, you wouldn't need to do that, would you?
 3        MS. CARR:  Objection.
 4        A.  I don't know.
 5        Q.  Does the bank ever take title to
 6   property collateral?
 7        A.  Does the bank ever take title?
 8        Q.  To collateral.
 9        A.  Yes.
10        Q.  Nonreal property collateral, let's use
11   a bill of sale type?
12        A.  Yes.
13        Q.  Do you ever then resell it later?
14        A.  Yes.
15        Q.  Would you give a new bill of sale?
16        A.  Yes.
17        Q.  Who is the owner on the new bill of
18   sale?
19        A.  The buyer.
20        Q.  Who is listed as the owner on the bill
21   of sale transferring title to the seller?
22        A.  The bank.
23        Q.  Correct.  That's because by virtue of
24   the prior bill of sale, you had it or some other
25   legal document that gave you ownership, correct?
```

---

Page 219

```
 1        A.  Yes.
 2        Q.  Could be a foreclosure order from a
 3   court?
 4        A.  Yes.
 5        Q.  Marshal's sale certificate?
 6        A.  Yes.
 7        Q.  Sheriff's sale certificate?
 8        A.  Yes.
 9        Q.  Sheriff's certificate of sale, they
10   call them lots of things, don't they?
11        A.  Yes.
12        Q.  Okay.
13           (Exhibit-44 marked.)
14        Q.  This is another version of this
15   document we received, Exhibit-No.-44, which has now
16   got handwritten in it, it looks like, unless it's a
17   funky typewriter, Peoples Bank information.  Do you
18   see that?
19        A.  I do.
20        Q.  Do you know whose handwriting it is?
21        A.  No.
22        Q.  It isn't yours?
23        A.  No.
24        Q.  Do you know who would have filled that
25   in for the bank?
```

---

Page 220

```
 1        A.  I don't.
 2        Q.  Again, to your recollection sitting
 3   here, do you recall if this document was ever
 4   recorded?
 5        A.  No.
 6        Q.  No, no recollection, or you don't think
 7   it was?
 8        A.  No recollection.
 9        Q.  A minute ago you didn't think it was?
10        A.  I don't think it was.
11        Q.  You see in paragraph 5 of that
12   document, --
13        A.  Yes.
14        Q.  -- it says the consideration Ms.
15   Nettleship received?
16        A.  Yes.
17        Q.  Would you read it out loud?
18        A.  "One dollar and other valuable
19   consideration unless otherwise stated."
20        Q.  And nothing else is otherwise stated,
21   correct?
22        A.  Correct.
23        Q.  Did you credit her a dollar on her
24   debt?
25        A.  No.
```

---

Page 221

```
 1        Q.  What was the other valuable
 2   consideration you gave her on May 25?
 3        MS. CARR:  Objection.
 4        Q.  None, right?
 5        A.  No.
 6        Q.  Sitting here looking at that document,
 7   does it refresh your recollection at all as to why
 8   the bank, why didn't we file this, why didn't we
 9   finish the loop on this document?  Any idea sitting
10   here?
11        A.  Yeah, an idea.
12        Q.  Okay.
13        A.  Typically, we have done this in a
14   number of other local cases, where we've accepted the
15   bill of sale from an owner, we'll hold that bill of
16   sale until there's a subsequent sale of the vessel
17   and then record the two bills of sale together.
18        Q.  Do you think that happened in this
19   case?
20        A.  No.
21        Q.  So great, so I understand that may be
22   typical.  You're not saying you actually have a
23   recollection of that in this case?
24        A.  I don't.
25        Q.  That would have possibly what you were
```

---

56 (Pages 218 to 221)

# EXHIBIT AA

Page 374

1    A.  I'm not sure.
2         MS. CARR:  Can we take a moment?
3         MR. BROWN:  Sure, why don't you guys
4    step outside and confirm, figure out what he wants to
5    say and you'll know.
6         (Brief recess.)
7    Q.  So after advice of counsel outside, do
8    you think you can shed any other light on this or you
9    think not?
10   A.  No.
11   Q.  That is fine.  Thank you.  We're going
12   to have more conversation that's going to be subject
13   to Ms. Carr's other objection for the day that's
14   going to be riding through on some of these
15   documents.
16        (Exhibit-58 marked.)
17   Q.  Handing you what's been marked as
18   Exhibit-58 -- Ms. Carr, I assume you have the same
19   objection, subject to us working it out with the
20   court at some point?
21        MS. CARR:  Yes.
22        MR. BROWN:  No problem.
23   Q.  So you see the middle of this, which is
24   Ms. Barratt is writing to Mr. Olson, Mr. Rees,
25   Mr. Loosmore and you?

Page 375

1    A.  Yes.
2    Q.  So you see that?
3    A.  Yes.
4    Q.  Would you read that out loud?
5    A.  "Amber, the high court has (finally)
6    entered judgment by default against the vessel.  I
7    will have the judgment sealed and will send it to you
8    with the bill of sale - unless you need the bill of
9    sale immediately, of course.  As per previous
10   instructions, we did not apply to have judgment
11   entered against Ms. Nettleship and will be
12   discontinuing the claim against her.  This does not
13   prevent further proceedings being issued in the
14   future, if that proves necessary."
15   Q.  "Kind regards," correct?
16   A.  "Kind regards."
17   Q.  Does that refresh your recollection
18   sitting here that the bank did not have counsel in
19   New Zealand proceed to try to get a judgment against
20   Ms. Barratt?
21   A.  Yes.
22   Q.  Would that be consistent with Ms.
23   Nettleship's claim that she signed over the bill of
24   sale expecting the matter against her to be finished?
25        MS. CARR:  Objection, legal conclusion.

Page 376

1    Q.  So that would be consistent with that.
2    If that was the deal you'd reached, if the deal was
3    we're not going to go forward against Ms. Nettleship
4    anymore, then this would be a consistent action with
5    that type of arrangement, would it not, Mr. Guildner?
6    A.  Yes.
7    Q.  Mr. Rees, who was he again?
8    A.  Colin?
9    Q.  Yes.
10   A.  The broker at Busfield.
11   Q.  Oh, he's the broker at Busfield.  Is he
12   your employee, is he the bank's employee, Mr.
13   Guildner?
14   A.  No.
15   Q.  Did you ever sign a contract with
16   Mr. Rees to do anything for you personally?
17   A.  No.
18   Q.  Were you paying him personally hourly
19   or any other sum aside from the commission that was
20   going to Busfield?
21   A.  No.
22   Q.  Was Busfield controlling his actions or
23   were you controlling his actions?
24   A.  I was --
25   Q.  Who was controlling Mr. Rees's personal

Page 377

1    actions, what he did, said, represented to people,
2    everything about that boat?
3         MS. CARR:  Objection.
4    Q.  You or Busfield?
5    A.  Well, both.
6    Q.  Really?  So tell me everything about
7    what you told Mr. Rees that he was supposed to do on
8    behalf of the bank.  Go ahead and start listing them.
9    You can't because you don't remember even talking to
10   him even once, did you?
11        MS. CARR:  Objection, you didn't give
12   him time to answer.
13   Q.  Well, are you going to change your
14   answer, Mr. Guildner?  Because you told me earlier I
15   can't recall specifically ever talking to Mr. Rees
16   for sure.
17   A.  No, I can't.
18   Q.  And I can't recall writing to Mr. Rees
19   for sure, except you know you're on the email chain
20   here, correct?
21   A.  Yes.
22   Q.  And that's all we've seen so far here
23   with you and Mr. Rees, correct?
24   A.  Yes.
25   Q.  So I'm asking you, did you control all

# EXHIBIT BB

Page 290

1    the marketing period for that?
2         A.  We asked for 30 to 180 days.
3         Q.  180 days, that sounds like a
4    dispositional value.  180 days is a very common
5    number, isn't it, in real estate for the banks?
6         A.  Yes.
7         Q.  Most every appraiser will give you a
8    180-day dispositional value, won't they?
9         A.  If you asked them for it, yes.
10        Q.  Does the Peoples Bank not ask for that
11   when it's doing its appraisals on real properties
12   that it might be selling?
13        A.  Not always, no.
14        Q.  Most of the time?
15        A.  No.
16        Q.  Really?
17        A.  Really.
18        Q.  What do you ask for?
19        A.  Fair market value.
20        Q.  And what is the marketing period that
21   they have to put to that?
22        A.  Reasonable.
23        Q.  And do they tell you what that is or do
24   they just leave to you wonder?
25        A.  They'll usually tell you what that is,

Page 291

1    what the typical marketing time is for that
2    marketplace at that time.
3         Q.  And what's it been lately in the United
4    States, at least in Washington here for us?
5         A.  Very fast.
6         Q.  How long do they give you on their
7    appraisals then?
8         A.  Right now, probably -- I have to back
9    up.  That would depend upon the type of property.
10        Q.  Commercial versus residential?
11        A.  Yes.
12        Q.  Okay.  So when you asked for a fair
13   market, what did you say, likely sale price, that's
14   the word you used, right?
15        A.  Yes.
16        Q.  Of course you're not actually
17   remembering this conversation, because I've already
18   asked you everything they told you and you don't have
19   a recollection, correct?
20        A.  That's correct.  I don't remember any
21   of the specifics, just generalities.
22        Q.  Generalities of a 200 to mid 200 New
23   Zealand dollars as a sale price, correct?
24        A.  Low to mid 200,000 New Zealand dollars.
25        Q.  Of New Zealand?

Page 292

1         A.  Yes.
2         Q.  Okay, and where did the 30 to 180-day
3    marketing value which from?
4         A.  I asked them.
5         Q.  You told them, estimate a 30 to 180-day
6    marketing?
7         A.  What I recall vaguely is that I asked
8    for a fairly short marketing time.
9         Q.  Was this before or after they told you
10   it was a soft market in New Zealand?
11        A.  I don't recall.
12        Q.  If it was before and then they told you
13   it was a short market time, would you then think
14   well, maybe I ought to rethink that, we might need
15   longer to market?
16        A.  I don't know.
17        Q.  Would it be reasonable?
18        A.  It might be reasonable.
19        Q.  If someone told you we're going to sell
20   this property for you, but this market is really
21   soft, not very many sales, wouldn't you anticipate
22   there is going to be a longer marketing period if you
23   want to get the fair price for it?
24        A.  Potentially, yes.
25        Q.  Do you remember any conversation about

Page 293

1    that?
2         A.  No.
3         Q.  Okay.  Why did you decide 30 to 180
4    days, vaguely as best you can say, a month to six
5    months vaguely?
6         A.  Because we wanted a fairly prompt sale.
7         Q.  Does the bank have any policies on
8    that?
9         A.  No.
10        Q.  It's totally the discretion of the loan
11   officer in handling it, in this case, the CCO?
12        A.  Yes.
13        Q.  Did anyone tell you that if we market
14   it longer, we can get a better price maybe?  Did you
15   ever have that conversation?
16        A.  No.
17        Q.  Did anybody talk about even if we
18   marketed it somewhere else, we might get a better
19   price for it?  Did anybody tell you that?
20        A.  No.
21        Q.  Did you consider any of that in your
22   decisionmaking to list this with Busfield Marine at a
23   30 to 180-day marketing event and the list price that
24   you chose?
25        A.  Not that I recall.

74  (Pages 290 to 293)

# EXHIBIT CC

**Christine Markowski**

| | |
|---|---|
| **From:** | Charlie Guildner |
| **Sent:** | Friday, April 13, 2012 8:44 AM |
| **To:** | 'Pauline Barratt' |
| **Cc:** | Dyan Swift; stan@loosmore.com |
| **Subject:** | RE: Vessel Arrest, Opua |

Thank you Pauline. Within the next two hours I will email you the signed and notarized affidavits and a confirmation that $11,000 NZD has been wired to your account. My best guess, having cruised the New Zealand and South Pacific waters myself, is that the vessel may be headed back north to the Bay of Islands perhaps on route to an island destination eventually. Most cruisers depart for the South Pacific and clear customs out of Opua when they leave.

This URL link: http://newtechinc.com/maamalni/maamalni_ak/gallery_v1/pages/DSC_0084b.htm contains many photos of the boat to assist in her identification. This is from the owners website.

Please let me know if you need any other assistance.

Charlie Guildner
Peoples Bank

**From:** Pauline Barratt [mailto:Pauline.Barratt@jonesfee.com]
**Sent:** Wednesday, March 07, 2012 6:40 PM
**To:** Charlie Guildner
**Cc:** Dyan Swift; stan@loosmore.com
**Subject:** RE: Vessel Arrest, Opua

Dear Charlie

Thank you for that information. Based on it, we have been able to determine that berthage at Opua for a vessel of that size is about $800 per month. We conveyed that to the court, which has said that it would require initial security of NZ $3000.

Stan and I have had a conversation this afternoon and he is going to discuss with you the specific information which we will need for the arrest. He did, though, ask me to send you our banking details for remittance of the security and other sums.

Details are:

Jones Fee Solicitors Trust Account
ASB Bank, Wyndham Branch, Auckland
Account no. 123109-0060983-02
Swift: ASBBNZ2A

New Zealand banks do not use Sort or IBAN codes, the above is all that is needed.

I would appreciate it if you would send NZ $11,000. That will cover the initial security ($3000), court filing fees and process server's costs ($3000) plus a deposit of $5000 for our fees – which will of course be fully accounted for and not taken from our trust account until an invoice is rendered. If you have any particular invoice requirements, please advise.

1

EXHIBIT 33
WITNESS Guildner
DATE 10/7/13

PB000453

Finally, it is legal requirement that I provide you with our terms of engagement before starting work, so those are now attached.  If you have any queries about anything in them, please do not hesitate to ask.

I look forward to working with you.

Kind regard

Pauline Barratt | Partner | DDI +64 9 373 0055 | Skype pauline.barratt1

Also admitted to the Supreme Court of Samoa

---

**From:** Charlie Guildner [mailto:Charlie.Guildner@peoplesbank-wa.com]
**Sent:** Thursday, 8 March 2012 10:11 a.m.
**To:** Pauline Barratt
**Cc:** Dyan Swift; 'stan@loosmore.com'
**Subject:** RE: Vessel Arrest, Opua

Thank you for the quick Reply Pauline.  The vessel in question is a pleasure craft.  It is a semi-custom 52 foot sailboat that was originally built in New Zealand.  It was later sold to our borrower and moved to the United States.  The couple that owns the LLC currently lives aboard the boat in Opua.  The debt owing on the boat is $300,000 USD and the value of the vessel is probably slightly more than the debt but not much.

I have included Stan on the CC line of this email so that he can work directly with you as well.

Charlie

---

**From:** Pauline Barratt [mailto:Pauline.Barratt@jonesfee.com]
**Sent:** Wednesday, March 07, 2012 12:20 PM
**To:** Charlie Guildner
**Cc:** Dyan Swift
**Subject:** RE: Vessel Arrest, Opua

Dear Charlie

Thank you for your email.  I would be delighted to assist your WA attorney.  Vessel arrest is relatively straight forward in this jurisdiction.

Pending hearing from Mr Loosemore, there is one practical consideration that I will bring to your attention now because it can sometimes create a timing issue if the vessel to be arrested is likely to leave the jurisdiction in a short time.  This is, that the court rules require security against the fees and charges of the arrest to be paid into court at the time of the arrest.  This is to cover the court's costs in obtaining insurance, paying berthage, paying for any necessary security / bunkers / crew repatriation costs etc; and if the security starts to run low it must be kept topped up.  Those costs take first priority in the event that the vessel is sold, and are then reimbursed to the arresting party.

I would need to know the size of the vessel at least, to be able to talk to the court about how much initial security would be required, but as an indication, it was necessary to pay initial security of NZ $20,000 recently in respect of a commercial ship at a commercial port (which Opua is not).

Court filing fees / document service fees come to about NZ $2700.

I hope that assists for the meantime.

Kind regards

PB000454